**Bidding Procedures Hearing Date:  September 9, 2009 at 10:00 a.m. (EDT)**
**Bidding Procedures Objection Deadline:  September 8, 2009 at 10:00 a.m. (EDT)**
**Sale Hearing Date: September 29, 2009 at 10:00 a.m. (EDT)**
**Sale Hearing Objection Deadline: September 28, 2009 at 10:00 a.m. (EDT)**

Ira S. Dizengoff (ID-9980)
David H. Botter (DB-2300)
Kenneth A. Davis (KD-9070)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                               :
In re:                                         :          Chapter 11
                                               :
PETRORIG I PTE LTD, <u>et al</u>.,             :          Case No. 09-13083 (JMP)
                                               :
                                               :
                          Debtors.<sup>1</sup> :          (Jointly Administered)
                                               :
                                               :
------------------------------------------------------------x

**MOTION FOR ENTRY OF (A) AN ORDER**
**(I) APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN ASSETS, (II)**
**SCHEDULING AUCTION DATE AND SALE HEARING DATE ON SHORTENED**
**NOTICE, (III) APPROVING THE FORM AND NOTICE THEREOF, AND (IV)**
**GRANTING RELATED RELIEF; AND (B) AN ORDER (I) AUTHORIZING THE SALE**
**OF CERTAIN ASSETS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT**
**OF CERTAIN CONTRACTS, AND (III) GRANTING RELATED RELIEF**

PetroRig I Pte Ltd ("<u>PetroRig I</u>"), PetroRig II Pte Ltd ("<u>PetroRig II</u>") and

PetroRig III Pte Ltd ("<u>PetroRig III</u>") (collectively, the "<u>Debtors</u>") by and through this motion

(the "<u>Motion</u>"), hereby move this Court pursuant to sections 105(a), 363 and 365 of title 11 of

the United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules"), for entry of:

(a) An order, in substantially the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"):

(i)     approving the proposed bidding procedures, substantially in the form of **Exhibit B** hereto (the "Bidding Procedures"), to govern the sale (the "Sale") of (x) all right, title and interest of each of PetroRig II and PetroRig III in two (2) oil rig construction contracts (as further defined below, the "Construction Contracts"), (y) all right, title and interest of PetroRig I in certain risers (the "Risers") related to the operation of Rig I (defined below) and (z) all right, title and interest of PetroRig I in certain rig-related equipment (the "Rig Equipment," and collectively with the Construction Contracts and the Risers, the "Sale Assets"), pursuant to and in accordance with the terms of a form asset purchase agreement (the "Form APA"), substantially in the form attached hereto as **Exhibit C**, or a modified Form APA, between the Debtors and the prevailing bidder(s) (as defined in the proposed Bidding Procedures, the "Prevailing Bidder(s)") at an auction (the "Auction");

(ii)    scheduling the Auction;

---

[1] The Debtors are PetroRig I Pte Ltd (09-13083), PetroRig II Pte Ltd (09-13084) and PetroRig III Pte Ltd (09-13085). The Debtors' cases are jointly administered under the lead case of PetroRig I pursuant to an order dated May 20, 2009 (Dkt. No. 13).

(iii)    shortening the notice period on, and scheduling, a hearing to approve the Sale (the "Sale Hearing");

(iv)    approving the form and manner of notice of the Sale, the proposed Bidding Procedures, the Auction and the Sale Hearing;

(v)    to the extent necessary, establishing procedures for determining adequate assurance of future performance of the Construction Contracts to be assumed and assigned in connection with the Sale; and

(vi)    granting such other and further relief as the Court deems necessary.

(b) An order following the Sale Hearing, in substantially the form attached hereto as **Exhibit D**, or a modified form proposed by the Prevailing Bidder(s) (the "Sale Order"):

(i)    approving either (a) the Form APA, or (b) a modified Form APA;

(ii)    authorizing the Sale to the Prevailing Bidder(s) at the Auction free and clear of any successor liability relating to the Debtors' businesses and all liens, claims, encumbrances and all other interests in, on or to the Sale Assets, pursuant to Bankruptcy Code section 363;

(iii)    authorizing the assumption and assignment of the Construction Contracts in connection with the Sale; and

(iv)    granting such other and further relief as the Court deems necessary.

In support of this Motion, the Debtors respectfully represent as follows:[2]

---

[2] The facts and circumstances in support of this Motion are set forth in the declaration of Eugene I. Davis, attached hereto as **Exhibit E**.

# I.    JURISDICTION

6.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

7.     The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and Local Bankruptcy Rules 6004-1 and 6006-1.

# II.    INTRODUCTION

8.     By way of this Motion, the Debtors seek to sell the Sale Assets to the Prevailing Bidder(s) through the auction process described below, free and clear of (i) successor liability relating to the Debtors' businesses, and (ii) all liens, claims, encumbrances, and all other interests in, on or to the Sale Assets.

9.     The Debtors seek to sell the Construction Contracts (defined below) because PetroRig II and PetroRig III lack the funding to make the remaining payments due under such contracts, and to sell the Risers and Rig Equipment because such assets may be used with the Rigs (defined below).

10.     The Debtors intend to conduct an auction for the Sale Assets, in accordance with the proposed bidding procedures described below, to ensure that the highest or best price is received for the Sale Assets, thereby maximizing the value of such assets to the Debtors' estates.

11.     The Debtors also seek an order shortening the notice period for the Sale Hearing in order to maximize the estates' recovery on the proposed Sale.  If PetroRig II cannot sell Construction Contract II (defined below) ahead of the September 30, 2009 delivery date of Rig II (defined below), PetroRig II may be in default under the contract for failure to make the last installment payment on the delivery date.  Upon default, the manufacturer may seek to terminate

Construction Contract II and foreclose on Rig II and sell it at a foreclosure sale, the proceeds of which are first applied to the sale and maintenance expenses, and then to any outstanding payments due under Construction Contract II. If any sale proceeds are remaining, they are refunded to PetroRig II, but such refund is limited to the aggregate amount already paid by PetroRig II to the manufacturer under the contract. Construction Contract II § 17.7(a). As a result, if the total sale proceeds exceed the sum of amounts paid, or owed, by PetroRig II to the manufacturer, the manufacturer may be contractually entitled to retain such excess proceeds, which would harm PetroRig II and its estate. Accordingly, PetroRig II must move quickly to sell Construction Contract II in order for its estate, and not the manufacturer, to recover any potential upside from the sale thereof.

12.     Moreover, if the Debtors do not quickly sell the Risers, which are specifically designed for use with each of the Rigs (defined below), the buyer or operator of each of the Rigs may purchase or lease similar risers from an alternate source. At that point, the Risers will have limited marketability because they would require very costly modifications to render them suitable for use with third parties' rigs. Accordingly, if the Risers are not sold to one of the buyers or operators of the Rigs, it is likely that the ultimate value obtained for the Risers will be greatly diminished.

13.     The remaining Sale Assets, consisting of Construction Contract III (defined below)[3] and the Rig Equipment, should also be sold as part of the same expedited Sale, because (i) Construction Contract III is in broadly similar format as Construction Contract II and has the same counterparty-manufacturer, thereby allowing potential purchasers to diligence both

---

[3] Although the Debtors believe that certain purchasers may have an interest in purchasing all of the Sale Assets together, resulting in a higher aggregate sale price for the Sale Assets than would be realized if each Sale Asset was

contracts efficiently, which could result in higher purchase prices for the contracts, (ii) potential purchasers may wish to purchase the Rig Equipment to use with the Rigs, and (iii) a collective, rather than piecemeal, sale of all the Sale Assets will avoid increased transaction costs associated with multiple sales and auctions.

### III.  BACKGROUND

#### A.  Chapter 11 Filing/Debtors' Businesses

14.  On May 17, 2009 (the "<u>Petition Date</u>"), each of PetroRig I, PetroRig II and PetroRig III filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

15.  On August 19, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "<u>Committee</u>"), comprised of (i) Larsen Oil and Gas Ltd; (ii) Cameron Int'l Corp.; (iii) Anchor Marine Supplies Pte Ltd; (iv) Chuan Huat Int'l; and (v) RS Components Pte Ltd.[4]

16.  The Debtors are Singapore incorporated entities that have each contracted for the construction of a new ultra deepwater semi submersible harsh environment drilling rig (each, a "<u>Rig</u>" and collectively, the "<u>Rigs</u>").  The Debtors have no employees other than their respective boards of directors, and all project management services are provided by third parties.

---

sold separately, the Debtors reserve the right to withdraw Construction Contract III should a longer marketing period appear necessary.

[4] The Debtors reserve their rights to object to the claims of the Committee members, their status as creditors of the Debtors and the composition of the Committee in general.

**B.  The Construction Contracts**

17.     Jurong Shipyard Pte Ltd ("Jurong") constructed or is constructing the Rigs for the Debtors in Singapore pursuant to the following construction contracts:  PetroRig I's "Rig I," assigned Hull No. 11-1087, was constructed pursuant to a construction contract dated October 21, 2005 between Jurong and PetroRig I ("Construction Contract I").[5]  PetroRig II's "Rig II," assigned Hull No. 11-1088, is being constructed pursuant to a construction contract dated March 23, 2005 between Jurong and PetroRig II ("Construction Contract II").  PetroRig III's "Rig III," assigned Hull No. 11-1089, is being constructed pursuant to a construction contract dated January 25, 2007 between Jurong and PetroRig III ("Construction Contract III," and collectively with Construction Contract II, the "Construction Contracts").  The total contract price for Construction Contract II is $483.4 million, and the total contract price for Construction Contract III is $523.9 million.

18.     Rig II is currently scheduled for delivery on September 30, 2009 and Rig III is currently scheduled for delivery on January 31, 2010.

19.     The Construction Contracts provide, among other things, that:

  a.     Each Debtor is entitled to appoint a representative at the Jurong shipyard to monitor the construction project relating to its Rig.  See, e.g., Construction Contract II § 7.1.

  b.     Title to each of the Rigs remains with Jurong until delivery.  Id. at § 9.1.

  c.     Delivery of a Rig will take place following "Technical Acceptance," which occurs once a Rig has undergone testing and Jurong has notified the relevant Debtor of the result of these trials.  Upon notice, the relevant Debtor is to confirm that it accepts the Rig.  If the trials demonstrate that the Rig does not comply with specifications, however, Jurong must undertake necessary remedial work.  Id. at §§ 12.4-12.14.

---

[5] Rig I has been sold by Jurong pursuant to a Court approved settlement, as set forth in more detail below.

d.     Upon delivery of a Rig, all outstanding amounts due to Jurong in respect of that Rig must be paid.  Id. at § 4.1.

e.     Jurong may be entitled to terminate the Construction Contract in certain circumstances, including upon any failure of a Debtor to pay any installment when due or if it fails to take delivery of the Rig in accordance with the terms of the Construction Contract.  Id. at §§ 17.1, 17.3.

f.     Following a default, Jurong may seek to terminate the Construction Contract and, at its discretion, complete the Rig and sell it on an 'as is' basis in a foreclosure sale, which may be by public auction or private sale, on such terms as Jurong sees fit, subject only to the duty to obtain a fair price.  Id. at §§ 17.3, 17.5.

g.     Any proceeds of such a foreclosure sale will be first applied to sale expenses, then to expenses associated with maintenance of the Rig pending sale, and then to any outstanding payments due under the applicable Construction Contract, including accrued default interest of 1.5% above LIBOR.  If any sale proceeds are remaining thereafter, they are refunded to the respective Debtor up to the total amount of payments made under the contract.  Id. at §§ 17.6(a), 17.7(a).

### C.     Prepetition Debt

20.     The Rig construction projects have been funded to date by bonds issued by PetroMena ASA ("PetroMena") and PetroRig III.  Specifically, on May 22, 2006, PetroMena, as issuer, and Norsk Tillitsmann ASA, as trustee (the "Trustee"), entered into a loan agreement (the "9.75% Loan Agreement," and the lender thereunder, the "9.75% Lender") for NOK 2 billion ($305.8 million as of May 17, 2009) pursuant to which PetroMena issued 9.75% Bonds due 2012 (the "9.75% Bonds").  On February 15, 2007, PetroRig III, as issuer, and the Trustee, entered into a loan agreement for NOK 1.6 billion ($244.7 million as of May 17, 2009) pursuant to which PetroRig III issued floating rate bonds due 2014 (the "FRN Bonds" and the lender thereunder, the "FRN Lender," and together with the 9.75% Lender, the "Secured Lenders").

21.     The 9.75% Bonds currently have the benefit of (i) an assignment by PetroRig I and PetroRig II to the Trustee of rights in and to Construction Contract I and Construction Contract II, including, but not limited to, the right to exercise certain remedies and direct construction of Rig I and Rig II; (ii) a security interest in a certain escrow account maintained

with respect to PetroRig I and PetroRig II; and (iii) an assignment of a certain refund guarantee in respect of Rig I and Rig II.

22. The FRN Bonds have the benefit of (i) an assignment by PetroRig III to the Trustee of rights in and to Construction Contract III, including, but not limited to the right to exercise certain remedies and direct construction of Rig III and (ii) a security interest in the escrow account maintained with respect to PetroRig III.

**D. Delivery of Rig I, the Adversary Proceeding, and Settlement Regarding Construction Contract I and the Sale of Rig I**

23. On the Petition Date, PetroRig I commenced an adversary proceeding in this Court against Jurong alleging a breach by Jurong of Construction Contract I with respect to Rig I (Adversary Proceeding No. 09-01234).

24. Pursuant to the Order Authorizing and Approving Stipulation of Settlement and Dismissal, signed and entered by the Court on June 4, 2009 (Dkt. No. 35), the Court authorized the Stipulation of Settlement and Dismissal, providing for, among other things, Jurong's sale of Rig I at a private sale conducted in Singapore, and the return of the excess proceeds of such sale, net of certain agreed amounts owing from PetroRig I to Jurong, to PetroRig I's bankruptcy estate. Recently, Jurong completed the sale of Rig I to Diamond Offshore Drilling Limited ("Diamond") and transferred the sale proceeds to PetroRig I, in the amount of approximately $205 million, which is being held in investments permitted by Bankruptcy Code section 345.

## IV. THE PROPOSED SALE

**A. The Construction Contracts**

25. As set forth above, the Debtors are obligated to pay the last installment payment under each of the Construction Contracts (*i.e.*, Construction Contract II and Construction Contract III) in order to take delivery of the Rigs, but currently lack the required funding to make

such payments. Accordingly, the Debtors seek to sell the Construction Contracts, free and clear of all successor liability relating to the Debtors' businesses and all liens, claims, encumbrances and all other interests in, on or to the Construction Contracts, pursuant to Bankruptcy Code section 363",...

26.     PetroRig II must move quickly to sell Construction Contract II ahead of the delivery date of Rig II in order to maximize recovery to the Debtors' estates. Pursuant to Addendum No. 1 to Construction Contract II, dated September 30, 2006, Rig II is scheduled to be delivered on September 30, 2009. The final installment payment for Construction Contract II is due on the delivery date. Construction Contract II § 4.1. Failure to make any installment payment on its due date results in a payment default. Id. at § 17.1(a). Upon a payment default, Jurong may seek to terminate[6] Construction Contract II, foreclose on Rig II and sell it by public auction or private sale. Id. at §§ 17.3, 17.5. Proceeds of any such sale are first applied to the sale expenses, then to expenses associated with maintenance of Rig II pending the sale thereof, and then to any outstanding payments due under Construction Contract II, including accrued default interest of LIBOR plus 1.5% . Id. at § 17.6(a). After such payments have been made, if any sale proceeds are remaining, they are refunded to PetroRig II. Id. at § 17.7(a). Such refund is limited, however, to the aggregate amount already paid by PetroRig II to Jurong under the contract. Id. As a result, to the extent the total sale proceeds exceed the sum of (a) the amounts already paid by PetroRig II to Jurong and (b) the balance due from PetroRig II to Jurong, Jurong may argue that it is contractually entitled to retain such excess proceeds, which would harm PetroRig II and its estate. Because PetroRig II may not benefit from any potential excess

---

[6] The Debtors reserve their right to contest any attempted termination of Construction Contract II or Construction Contract III as a violation of the automatic stay imposed by section 362 of the Bankruptcy Code.

proceeds in the event that Jurong sells Rig II, it is imperative that PetroRig II move quickly to sell Construction Contract II before Rig II is complete so that PetroRig II can, without dispute, recover any potential upside from the sale of Construction Contract II.

27. Because Construction Contract III is substantially similar to Construction Contract II (save for construction price, Rig specification and construction schedules) and has the same counterparty-manufacturer, thereby allowing potential purchasers to diligence both contracts efficiently, Construction Contract III should be sold in lockstep with the other Sale Assets.

28. As part of the Sale, the Debtors will seek to assume and assign the Construction Contracts to the Prevailing Bidder(s) at the Auction. Pursuant to the assignment provisions of the Construction Contracts, which are identical to one another, Jurong may not unreasonably withhold approval of an assignment of the Construction Contracts. The Debtors believe, however, that Jurong will consent to such assignment following the Debtors' identification of each Qualified Bidder to Jurong and the Debtors' delivery to Jurong of any information, relating to adequate assurance of future performance by each such Qualified Bidder, received by the Debtors, as provided in the proposed Bidding Procedures. If, however, Jurong does not consent, the Debtors will seek, as part of the proposed Sale Order, a finding that certain conditional assignment provisions of the Construction Contracts are unenforceable pursuant to Bankruptcy Code section 365(f).

29. In addition, to the extent that the Debtors determine that they have the ability to assume and assign any leases for the operation of the Rigs, and it makes economic sense to do so, they may seek to include such interests in the Sale Assets, at the Auction.

### B.    The Risers and the Rig Equipment

30.    Prior to the Petition Date, PetroRig I purchased through Aker Kvaerner MH AS ("Aker"), the Risers,[7] which consist of 41 bare riser joints with auxiliary lines and buoyancy for 36 of the riser joints, to use in connection with Rig I, and paid Aker for the Risers in full.  The Risers were designed specifically to guide the drill operated from the Rigs to the ocean floor.  Upon information and belief, the Risers are currently located in the Louisiana storage facility of Chet Morrison Contractors at #9 Bayou Bularge Road, Houma, LA.  As one of the buyers or operators of the Rigs is the most likely bidder for the Risers, and the Risers are specifically designed for use with the Rigs, if the Risers are not sold to one of the buyers or operators of the Rigs as part of the Sale, it is likely that the ultimate value obtained for the Risers will be greatly diminished.

31.    Prior to the Petition Date, PetroRig I also purchased, and paid for in full, the Rig Equipment,[8] which relate to the operation of Rig I, but may also be used with Rig II and Rig III.  A complete list of the Rig Equipment is set forth in Exhibit A to the APA.  The Debtors seek to sell the Rig Equipment as part of the expedited Sale, because potential purchasers may wish to purchase the Rig Equipment to use with either of the Rigs.

---

[7] Through discovery, PetroRig I has received from Larsen Oil and Gas Pte Ltd ("LOG") certain documentation that appears to indicate that LOG may have a purported claim with respect to the Risers.  Though PetroRig I maintains it is the rightful owner of the Risers, the proceeds of the Risers will be deposited into an escrow account for the benefit of any party, including LOG, asserting a lien, claim, encumbrance or interest in the Risers, as set forth in detail in section VI(B)(2) of this Motion.

[8] An interpleader action to determine competing ownership and other interests in the Rig Equipment was commenced by Jurong in the High Court of Singapore (OS 854, 2009/C) against PetroRig I, LOG, Petrolia Services AS and COR International Ltd (Dubai).  Although LOG has agreed not to assert any ownership claim or other interest in the Rig Equipment, the ownership interests of the other parties has not been finally resolved.  The Debtors will serve the Motion and notice of the Bidding Procedures Hearing, Sale, Auction and Sale Hearing on such parties.  Though PetroRig I asserts that it is the rightful owner of the Rig Equipment, the proceeds of the Rig Equipment will be deposited into an escrow account for the benefit of any party asserting a lien, claim, encumbrance or interest in the Rig Equipment, as set forth in detail in section VI(B)(2) of this Motion.

### C. Proposed Retention of Financial Advisor to Assist in the Sale

32.     To maximize the value of the Sale Assets, the Debtors require the experience and expertise of a financial advisor to assist them in conducting the Auction and Sale.  Accordingly, the Debtors intend to seek, by appropriate application with this Court,[9] the retention of Diamond S. Management LLC ("Diamond Management"), as their financial advisor to assist them in the marketing and auction of the Sale Assets.  Diamond Management, which has significant industry experience relevant to the purchase and sale of such assets, will advise and consult with the Debtors and their counsel, as well as the Secured Lenders and their professionals, in order to ensure that the highest possible value is realized for the Sale Assets, consistent with the Debtors' duty to their creditors to maximize the value of their estates for all creditors.

### D. The Asset Purchase Agreement

33.     Subject to the Court's approval at the Sale Hearing, the Debtors intend to enter into the Form APA, or a modified Form APA, with the Prevailing Bidder(s) at the Auction.  The Debtors have drafted the Form APA to be used as a template for submission of bids.  The Debtors believe that the use of a single template for bids will make the task of comparing bids more efficient.

34.     As more fully described in the Form APA, the Debtors propose to sell the Sale Assets on terms and conditions customary for transactions of this type, subject to higher or better bids through the Auction process:[10]

---

[9] The Debtors are finalizing the details of Diamond Management's proposed engagement, and intend to file an application to retain Diamond Management promptly with the Court.

[10] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Form APA, a copy of which is attached hereto as **Exhibit C**.

### E.    The Proposed Bidding Procedures

35.    The Debtors have adopted the proposed Bidding Procedures, attached hereto as **Exhibit B**, which, among other things, require:[11]

      (a) as a prerequisite to becoming a Qualified Bidder (and, thus, being able to conduct due diligence), a Potential Bidder shall, among other things, provide an executed confidentiality agreement and financial information to allow the Debtors to determine that the Potential Bidder has the financial wherewithal to close the Sale; and

      (b) each Qualified Bidder, in order for its bid to be deemed a Qualified Bid, must deliver to the Debtors' Counsel a written bid by the Bid Deadline for some or all of the Sale Assets that:

- states such Qualified Bidder offers to purchase some or all of the Sale Assets upon the terms and conditions substantially as set forth in the Form APA, or pursuant to an alternative structure that the Debtors determine is no less favorable than the terms and conditions of the Form APA (as determined by the Debtors in their reasonable business judgment), including, without limitation, the assumption of the obligations under the applicable Construction Contract(s) pursuant to an assignment by one or both of the Debtors, if applicable;

- does not request or entitle such Qualified Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

- is likely to result in a value, in the Debtors' reasonable business judgment, after consultation with their advisors, that is more than:

      (a)    in the case of Construction Contract II, $480 million, including all remaining installment payments and other amounts due under such contract;

      (b)    in the case of Construction Contract III, $523.9 million, including all remaining installment payments and other amounts due under such contract; and

      (c)    in the case of the Risers, $15 million.[12]

---

[11] Once the Bidding Procedures Order is entered, bid packages will be sent out to all parties that have expressed or could be expected to express an interest in acquiring some or all of the Sale Assets.

[12] The Debtors have not established a reserve price for the Rig Equipment at this time, but, pursuant to the generally applicable provisions of the proposed Bidding Procedures, reserve the right to withdraw the Rig Equipment from the Auction in the event that the bids submitted for the Rig Equipment are of insufficient value.

- is accompanied by a cash deposit in the amount of 10% of the aggregate bid amount.

36.     In order to ensure that the highest or best price is received for some or all of the Sale Assets, the Debtors have established the proposed Bidding Procedures to govern the submission of bids before and during the Auction.  The Debtors believe that the proposed Bidding Procedures will enable them to have the best chance and opportunity to procure bids for the purchase of the Sale Assets, and will allow a controlled and fair process whereby the value received by the estates will be maximized to the fullest extent possible under the circumstances.

37.     Upon selection of the Prevailing Bid(s) (as defined in the proposed Bidding Procedures), the Debtors will file with the Court a notice of selection of the Prevailing Bid(s) that will attach as an exhibit a copy of the executed Form APA (or modified Form APA, as applicable), setting forth the terms of the proposed Sale to the Prevailing Bidder(s) (as defined in the proposed Bidding Procedures).

## V.     RELIEF REQUESTED

38.     By this Motion, the Debtors request entry of:

(a) the proposed Bidding Procedures Order:

    (i)     approving the proposed Bidding Procedures, substantially in the form of **Exhibit B** attached hereto, to govern the Sale;

    (ii)    scheduling the Auction;

    (iii)   shortening the notice period on, and scheduling, the Sale Hearing;

    (iv)    approving the form and manner of notice of the Sale, the proposed Bidding Procedures, the Auction and the Sale Hearing;

    (v)     to the extent necessary, establishing procedures for determining adequate assurance of future performance by the Prevailing Bidder(s) under the Construction Contracts; and

    (vi)    granting such other and further relief as the Court deems necessary.

(b) the proposed Sale Order following the Sale Hearing:

    (i)        approving either (a) the Form APA, or (b) a modified Form APA;

    (ii)      authorizing the Sale to the Prevailing Bidder(s) at the Auction free and clear of any successor liability relating to the Debtors' businesses and all liens, claims, encumbrances and all other interests in, on or to some or all of the Sale Assets, pursuant to Bankruptcy Code section 363;

    (iii)     authorizing the assumption and assignment of the Construction Contracts in connection with the Sale of such contracts; and

    (iv)    granting such other and further relief as the Court deems necessary.

39.     The Debtors also request that the Court approve the following expedited schedule, in order to, as set forth more fully below, (a) preserve PetroRig II's ability to capture all available excess sale proceeds of Rig II, (b) obtain maximum value for the Risers by selling them before the buyer or operator of each of the Rigs purchase or lease similar risers from an alternate source and (c) packaging all the Sale Assets for simultaneous sale in order to minimize disposition cost and maximize the value of the Sale Assets:

| | |
|---|---|
| September 24, 2009 at 10:00 a.m. (EDT) | Bidding Deadline |
| September 25, 2009 at 10:00 a.m. (EDT) | Auction |
| September 28, 2009 at 10:00 a.m. (EDT) | Deadline for Objections to the Sale |
| September 29, 2009 at 10:00 a.m. (EDT) | Sale Hearing |
| September 30, 2009 | Sale Closing Date |

40.     In addition, the Debtors request that both the proposed Bidding Procedures Order and the proposed Sale Order be deemed effective immediately, upon their entry, by waiving the ten-day stay under Bankruptcy Rules 6004(h) and 6006(d).

## VI.     BASIS FOR RELIEF

41.     In accordance with Bankruptcy Rule 6004, sales of property outside the ordinary course of business may be made by private sale or public auction.  The Debtors have determined that the Sale by public auction will enable them to obtain the highest or best bid for the Sale Assets and is in the best interest of the Debtors, their estates and their creditors.

**A.     Entry of The Proposed Bidding Procedures Order is Appropriate and In The Best Interest Of The Estate and Creditors, and the Proposed Notice of the Sale, the Bidding Procedures, the Auction, and the Sale Hearing is Appropriate.**

**1.     The Proposed Bidding Procedures are Appropriate and Will Maximize the Value Received for the Sale Assets.**

42.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.  See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

43.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See, e.g., Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Products, Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

44.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See, e.g., Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Financial News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate").

45.     The Debtors believe that the proposed Bidding Procedures will establish the parameters under which the value of the Sale Assets may be tested at the Auction and ensuing Sale Hearing. Such procedures unquestionably will increase the likelihood that the Debtors will receive the greatest possible consideration for the Sale Assets because they will ensure a competitive and fair bidding process. The proposed Bidding Procedures also will allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their estates.

46.     The Debtors believe that the Auction and the proposed Bidding Procedures will promote active bidding from seriously interested parties and dispel any doubt as to the best or highest bid reasonably available for the Sale Assets. The proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the proposed Bidding Procedures (i) will encourage bidding for the Sale Assets, (ii) are consistent with other procedures previously approved by this Court and (iii) are appropriate under the relevant standards governing auction proceedings and

bidding incentives in bankruptcy proceedings.  See Integrated Resources, 147 B.R. at 659; 995 Fifth Avenue Assocs., 96 B.R. at 28.

47.     Moreover, the proposed Bidding Procedures are carefully crafted to maximize the value of the Sale Assets given the short amount of available time to market and sell such assets. Thus, based on the foregoing, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances because they will serve to maximize the value that the Debtors will recover on account of the Sale.

> **2.      The Proposed Shortened Notice of the Sale, the Bidding Procedures, the Auction, and the Sale Hearing is Appropriate.**

48.     The Debtors are required to notify creditors and parties who have liens or other interests in the Sale Assets of the proposed Sale, including a disclosure of the time and place of the Auction, the Sale Hearing, the terms and conditions of the Sale, and the deadline for filing any objections thereto.  See Bankruptcy Rule 2002(a), (c) and 6004(c).  The Debtors submit that (a) the circumstances attendant to these cases constitute the requisite "cause" to shorten certain required notice periods, and (b) the form and method of notice of the Sale and Auction is appropriate under the circumstances, as set forth below.

> **(a)      Shortened Notice of the Sale Hearing Is Appropriate Given the Circumstances**

49.     The Debtors believe that they will obtain the maximum recovery for the Sale Assets through a well-advertised Sale and Auction.  The Debtors have already taken steps to canvass the market and pinpoint the universe of parties interested in purchasing the Sale Assets. The Debtors believe that, due to the time constraints described herein, they must move quickly in order to maximize value.  Despite the proposed shortened timeline, the Debtors believe that the potential purchasers of the Sale Assets are well aware that the Sale of such assets is forthcoming.

50.     In light of the foregoing, the Debtors seek this Court's approval of the expedited schedule set forth in the chart appearing in Section V. (Relief Requested), above, for the conduct of the Auction and Sale, and shortening certain applicable notice periods.  Bankruptcy Rules 2002(a)(2) and 9006(c)(1) authorize the Court, for cause shown, to reduce the notice period for the Sale Hearing.  Consistent with the Debtors' proposed schedule, this Court should (a) shorten (i) the 20-day notice period required for the Sale Hearing pursuant to Bankruptcy Rule 2002(a)(2) and (ii) the three (3) additional days required for mailing of notices pursuant to Bankruptcy Rule 9006(f), and (b) set a time and date for the Sale Hearing and deadline to file and serve objections to the proposed Sale that is consistent with the Debtors' proposed schedule..

51.     Ample cause exists to reduce the notice period.  As set forth above, if PetroRig II cannot sell Construction Contract II by Rig II's delivery date (currently scheduled for September 30, 2009), Jurong may seek to terminate Construction Contract II and foreclose on Rig II and sell it through a foreclosure sale, in which Jurong, rather than PetroRig II, will recover any proceeds of sale that exceed the amounts paid, and owed, by PetroRig II to Jurong.  Similarly, if the Debtors do not quickly sell the Risers, which are specifically designed for use with the Rigs, the buyer or operator of each of the Rigs may purchase or lease similar risers from an alternate source.  At that point, the Risers will have limited marketability because they would require very costly modifications to render them suitable for use with third parties' rigs, and consequently, it is likely that the ultimate value obtained for the Risers will be greatly diminished.

52.     Moreover, (i) because Construction Contract III is substantially similar to Construction Contract II (save for construction price, Rig specification and construction schedules) and has the same counterparty-manufacturer, thereby allowing potential purchasers to review and analyze both contracts efficiently, which could result in higher purchase prices for the

contracts, and (ii) because the Rig Equipment may be used with the Rigs to be built under the Construction Contracts, Construction Contract III and the Rig Equipment should be sold in lockstep with the other Sale Assets.

53.     Finally, there is an industry-wide expectation that the Sale Assets will be sold and accordingly, a lengthy marketing period is not required.  Indeed, the Debtors already have been contacted by third party bidders, prior to the commencement of the formal auction process, seeking due diligence information necessary for such third parties to develop bids for the Sale Assets.  Moreover, the Debtors will save significant resources by marketing the Sale Assets internationally, in a single marketing campaign.

54.     Accordingly, sufficient cause exists to shorten the notice period for the Sale Hearing in accordance with the proposed schedule.

**55.     The Debtors' Proposed Form and Method of Notice of the Sale, Bidding Procedures and Sale Hearing Is Reasonable**

56.     The Debtors propose that notice of the Sale, the Bidding Procedures Order (and the Bidding Procedures), the Auction, and the Sale Hearing be deemed adequate and sufficient if within one (1) business day of the entry of the Bidding Procedures Order, the Debtors (or their agents) serve by overnight mail, fax or electronic mail copies of the (i) the entered Bidding Procedures Order, (ii) the authorized Bidding Procedures, and (iii) a detailed notice that provides the date, time and place of the Auction and the Sale Hearing, and the time fixed for filing objections to the Sale (collectively, the "Notice of Sale, Auction and Sale Hearing"), substantially in the form attached hereto as **Exhibit F**, on the Notice Parties (as defined below in Section VIII. Notice).

57.     Within three (3) business days of the entry of the proposed Bidding Procedures Order, the Debtors also will publish the proposed Notice of Sale, Auction and Sale Hearing on

one occasion in the national editions of the *Wall Street Journal* (United States)*,* the *Financial Times* (United Kingdom), *Finansavisen* (Norway), and *The Business Times* (Singapore).

58.     Such notice is consistent with the form of notice of other pleadings, including the notice of the deadline to file proofs of claim in the PetroRig I case, and is intended, through the use of electronic mail, fax, or overnight courier and publication to effect service as quickly as possible in the context of the expedited schedule proposed herein.   All parties, including all potential bidders at the Auction, other parties in interest and Jurong, will thus receive prompt notice.   Accordingly, the Debtors submit that the foregoing method of notice is reasonable under the circumstances.

**B.     Approval of The Sale Is Appropriate and In The Best Interests of The Estates.**

**1.     The Sale is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment.**

59.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).   Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, the Second Circuit has required that such use, sale or lease be based upon the sound business judgment of the debtor.   See The Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business).   In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee

of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

60.     The business judgment rule shields a debtor's management from judicial second-guessing.  Johns-Manville Corp., 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions").  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).  Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions.  See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

61.     The Debtors have proposed the Sale after thorough consideration of all viable alternatives and believe that they can monetize the long-term operational value of the Sale Assets today, without undertaking the risk of expending additional capital.  Regardless, because the Debtors have no ready access to such capital or a means of making the final installment payments on the Construction Contracts, it is impossible for the Debtors to expect Jurong's continued performance under the Construction Contracts.  Moreover, without the Rigs, the Debtors have no need for the other Sale Assets.  The adequacy of the consideration to be

received for the Sale Assets will be tested through the Auction consistent with the requirements of the Bankruptcy Code, Bankruptcy Rules and pursuant to procedures approved by the Court. Consequently, the fairness and reasonableness of the consideration to be paid will be demonstrated by adequate "market exposure" and an open and fair auction process – the best means for establishing whether a fair and reasonable price is being paid. Thus, the Debtors request that the Court make a finding at the Sale Hearing that the proposed Sale is a proper exercise of their business judgment and is authorized.

> **2.** **The Sale Free and Clear of All Liens, Claims, Encumbrances and All Other Interests is Authorized by Section 363(f).**

62. The Debtors further submit that it is appropriate to sell the Sale Assets free and clear of all liens,[13] claims, encumbrances and all other interests, if any, pursuant to section 363(f) of the Bankruptcy Code, with any such interests attaching to the net Sale proceeds, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, encumbrances and all other interests if: (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

---

[13] The term "liens" includes all liens, liabilities and Claims (as such term is defined in section 101 of the Bankruptcy Code) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise, charges, pledges, security interests, conditional sales agreements or other title retention agreements, leases, mortgages, options or other encumbrances (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or similar statute, as applicable).

63.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

64.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Sale Assets "free and clear" of liens, claims, encumbrances and all other interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

65.     Although parties in interest may assert liens, claims, encumbrances or other interests in, to or against the Sale Assets, any such parties will be adequately protected by having their liens, claims, encumbrances or other interests, if any, attach to the proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such parties had prior to the Sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.

66.     Moreover, the proceeds of the Sale will be deposited into an escrow account for the benefit of any party asserting a lien, claim, encumbrance or other interest in some or all of the Sale Assets.  Such proceeds will remain in escrow pending the resolution of any such claims

asserted in the form of an objection to the Sale filed prior to the Sale objection deadline in accordance with the proposed Bidding Procedures Order.

67.     Furthermore, the Debtors are informed that the Secured Lenders, which have liens on the Construction Contracts, will consent to the Sale of the Construction Contracts, assuming that the proposed minimum bid amounts for the Construction Contracts are met.  This consent is based on the adequate protection measures discussed above.[14]

68.     Accordingly, section 363(f) authorizes the transfer and conveyance of the Sale Assets free and clear of all liens, claims, encumbrances and all other interests.

**3.     The Sale Assets Should Be Sold Free and Clear of Successor Liability Relating to the Debtors' Businesses.**

69.     Under the terms of the Form APA, the Prevailing Bidder(s) is also not liable for any liabilities as a successor to the Debtors' businesses.   Such a provision ensures that the Prevailing Bidder(s) is protected from any claims or lawsuits premised on the theory that the Prevailing Bidder(s) is a successor to one or more of the Debtors as a result of a consolidation, merger or de facto merger of the Prevailing Bidder(s) and the Debtors.   Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability relating to the debtor's business.   See MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("…state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."), aff'd, 2009 U.S. App. LEXIS

17441 (2d Cir. Aug. 5, 2009); In re Trans World Airlines, Inc., 322 F.3d 283, 288-89 (3d Cir. 2003) (holding that section 363(f) permits sales free and clear of successor liability); The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear). The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.

70. Accordingly, the Sale Order should state that the Prevailing Bidder(s) is not liable under any theory of successor liability relating to the Debtors' businesses.

### 4. The Prevailing Bidder(s) is Entitled to the Full Protection of Section 363(m), and the Sale Does Not Violate Section 363(n).

71. The Debtors intend to seek a finding by the Court, to the extent supported by the facts, that the Prevailing Bidder(s) is entitled to the full protections of Bankruptcy Code section 363(m). The Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony

---

[14] The proceeds of the Construction Contracts will remain subject to the liens of the Secured Lenders in the Construction Contracts, and the provisions of, among other things, the Final Order Authorizing Use of Cash

<u>Hill Assocs.)</u>, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); <u>see also</u> <u>In re Angelika Films, 57th, Inc.</u>, 1997 WL 283412, at *7 (S.D.N.Y. 1997); <u>In re Bakalis</u>, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

72.     Here, the Prevailing Bidder(s) will have engaged in the Auction pursuant to the proposed Bidding Procedures.  Moreover, by subjecting the Sale Assets to a market test through the Auction, the Debtors submit that the consideration to be received will be fair and reasonable.

73.     As a result of the foregoing, the Debtors expect that the Sale will not constitute an avoidable transaction pursuant to section 363(n), and accordingly, the Prevailing Bidder(s) should receive the protections afforded good faith purchasers by section 363(m).

74.     In light of the foregoing, the Debtors seek a finding by the Court, to the extent supported by the facts, that the Prevailing Bidder(s) is entitled to the full protections of Bankruptcy Code section 363(m).

### 5.     Assumption and Assignment of the Construction Contracts is Authorized by Section 365 of the Bankruptcy Code.

75.     As part of the Sale of the Construction Contracts, the Debtors will also assume and assign the Construction Contracts to the Prevailing Bidder(s).

76.     Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor.  11 U.S.C. § 365(a) and (b); <u>In re Jamesway Corp.</u>, 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996).  Under section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

---

Collateral, dated August 6, 2009, governing the treatment of such lenders' cash collateral.

77.     The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

78.     Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  See In re Paolo Gucci, 193 B.R. 411, 414 (S.D.N.Y. 1996); see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989); In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract.  A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet.").

79.     In the present case, the Debtors' assumption and assignment of the Construction Contracts to the Prevailing Bidder(s) meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code.  As discussed above, the transactions contemplated herein will provide significant benefits to the Debtors' estates.  Because the Debtors cannot obtain the benefits of the Sale of the Construction Contracts without the

assumption and assignment of the Construction Contracts, the assumption of these contracts is undoubtedly a sound exercise of the Debtors' business judgment.

80.     Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  See 11 U.S.C. § 365(f)(2).  Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. at 605-06 (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

81.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993).

82.     Here, as part of the proposed Bidding Procedures, each Qualified Bidder (as defined in the proposed Bidding Procedures) must demonstrate, as part of its Qualified Bid, that it is financially capable of consummating the transactions contemplated by its offer, including the assumption of, and continued performance under, the Construction Contracts.  The Debtors will, in turn, identify each Qualified Bidder to counsel to Jurong and serve counsel to Jurong with any information relating to adequate assurance of future performance of the Construction Contracts

by each Qualified Bidder, by email or overnight delivery, immediately following the Debtors' receipt thereof. Pursuant to the assignment provisions of the Construction Contracts, which are identical to one another, Jurong may not "unreasonably with[hold]" approval of an assignment of the Construction Contracts. <u>See, e.g.</u>, Construction Contract II § 21.1 ("[n]either party may, without the prior written approval (such approval not be unreasonably withheld) of the other party, assign the benefit of this Contract [(the "<u>Conditional Assignment Provision</u>")].") The Debtors are committed to working cooperatively with Jurong and the Prevailing Bidder(s) at the Auction to allay any concerns Jurong may have as to the Prevailing Bidder(s)' assurances of future performance under the Construction Contracts. Accordingly, the Debtors are hopeful that Jurong will consent to the assignment of the Construction Contracts.

83. The Prevailing Bidder(s) will, in turn, also be required to demonstrate to the satisfaction of the Court, adequate assurance of future performance. The Sale Hearing will therefore provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the Prevailing Bidder(s) to provide adequate assurance of future performance under the Construction Contracts, including, without limitation, the ability to make any remaining installment payments and pay any other amounts due under the Construction Contracts. Accordingly, the Debtors submit that the assumption and assignment of the Construction Contracts, as set forth herein, should be approved.

84. If, however, Jurong does not consent to such assignment, the Debtors request that the Court determine that the Conditional Assignment Provisions of the Construction Contracts do not restrict, limit or prohibit the assumption, assignment and sale of the Construction Contracts and are unenforceable pursuant to Bankruptcy Code section 365(f).

85.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such conditional assignment restrictions, as follows:

> (1) [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
>
> (2) The Trustee may assign an executory contract or unexpired lease of the debtor only if—
>
>> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>>
>> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(l)-(2).

86.     As a result, provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease are unenforceable.  See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (courts must carefully scrutinize anti-assignment provisions under Section 365(f)); In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions.").

87.     Accordingly, if Jurong does not consent to the assignment of the Construction Contracts, the Debtors request that the Conditional Assignment Provisions of the Construction Contracts be deemed unenforceable, consistent with section 365(f), because (i) the Debtors will assume the Construction Contracts and (ii) the Prevailing Bidder(s) will be required to provide adequate assurance of performance under such contracts.

### 6. Relief Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate.

88. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that any sale order be effective immediately by providing that the 10-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

89. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, *Collier* suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶ 6064.09 (L. King, 15 rev. ed. 1988). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

90. To maximize the value received for the Sale Assets at the Auction, and for all the reasons discussed above, the Debtors seek to close the Sale as soon as possible after the Sale Hearing and, in the case of Construction Contract II, before the September 30, 2009 scheduled delivery date for Rig II. Accordingly, the Debtors hereby request that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d), or, in the alternative, if an objection to

the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file an appeal.

## VII. WAIVER OF MEMORANDUM OF LAW

91.     The legal authority supporting the relief requested by this Motion has been cited herein.  Accordingly, the Debtors respectfully request that the Court waive the requirement in Rule 9013-1 of the Local Bankruptcy Rules that a motion be accompanied by a memorandum of law.

## VIII. NOTICE

92.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) each member of the Official Committee of Unsecured Creditors and any known counsel to such committee[15]; (c) the trustee for the Debtors' secured lenders; (d) Seadrill Deepwater Units Pte Ltd; (e) Jurong Shipyard Pte Ltd; (f) PetroMena, ASA; (g) PetroMena, Ltd.; (h) Lloyds TSB Bank plc; (i) Aker Kvaerner MH AS; (j) Chet Morrison Contractors; (k) Petrolia Services AS; (l) COR International Ltd (Dubai); (m) the Internal Revenue Service; (n) the Securities and Exchange Commission; (o) all parties having filed notices of appearances in these cases; and (p) all persons known or reasonably believed to have expressed an interest in acquiring some or all of the Sale Assets (collectively, the "Notice Parties").

---

[15] As of the date hereof, the Debtors have not received notice that the Committee has selected counsel.

34

WHEREFORE, the Debtors request that the Court grant the relief requested

herein and such other and further relief as is just and proper.

New York, New York
Dated: September 1, 2009

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

/s/ Ira S. Dizengoff
Ira S. Dizengoff (ID-9980)
David H. Botter (DB-2300)
Kenneth A. Davis (KD-9070)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Attorneys for the Debtors and Debtors in Possession