Ira S. Dizengoff (ID-9980)
David H. Botter (DB-2300)
Kenneth A. Davis (KD-9070)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                              :
In re:                                        :        Chapter 11
                                              :
PETRORIG I PTE LTD, et al.,                   :        Case No. 09-13083 (JMP)
                                              :
                                              :
                        Debtors.[2]           :        (Jointly Administered)
                                              :
                                              :
---------------------------------------------------------------x

**APPLICATION PURSUANT TO BANKRUPTCY RULE 2014(a) FOR ENTRY OF
AN ORDER UNDER SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY
CODE AUTHORIZING THE EMPLOYMENT AND RETENTION OF
DIAMOND S. MANAGEMENT AS FINANCIAL ADVISOR
TO THE DEBTORS NUNC PRO TUNC TO AUGUST 15, 2009**

PetroRig II Pte Ltd ("PetroRig II") and PetroRig III Pte Ltd ("PetroRig III") (collectively,

the "Debtors," and each individually, a "Debtor") hereby file this application (the "Application"),

pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), for the entry of an order, substantially in the form attached hereto as **Exhibit C**,

---

[2] The Debtors are PetroRig I Pte Ltd ("PetroRig I"), PetroRig II Pte Ltd ("PetroRig II") and PetroRig III
Pte Ltd ("PetroRig III"). The Debtors' cases are jointly administered under the lead case of PetroRig I pursuant to
an order dated May 20, 2009 (Dkt. No. 13). The case number for PetroRig II is 09-13084 and the case number for
PetroRig III is 09-13085.

authorizing the Debtors to retain and employ Diamond S. Management ("DSM"), as financial advisor to the Debtors *nunc pro tunc* to August 15, 2009. In support of this Application, the Debtors rely on the Declaration of Peter K. Ekvall (the "Ekvall Declaration"), the Vice President – Commercial of DSM, attached to this Application as **Exhibit A** and incorporated herein by reference. In further support of this Application, the Debtors respectfully state as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has jurisdiction over the Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     The statutory predicates for the relief sought herein are sections 327, 328, and 331 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.     BACKGROUND

### A.     Chapter 11 Filing/Debtors' Businesses

3.     On May 17, 2009 (the "Petition Date"), each of PetroRig I, PetroRig II and PetroRig III filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

4.     On August 19, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors, comprised of (i) Larsen Oil and Gas Ltd; (ii) Cameron Int'l Corp.; (iii) Anchor Marine Supplies Pte Ltd; (iv) Chuan Huat Int'l; and (v) RS Components Pte Ltd. (the "Committee").

5.     The Debtors are Singapore incorporated entities that have each contracted for the construction of a new ultra deepwater semi submersible harsh environment drilling rig (each, a "<u>Rig</u>" and collectively, the "<u>Rigs</u>").  The Debtors have no employees other than their respective boards of directors, and all project management services are provided by third parties.

**B.     The Construction Contracts**

6.     Jurong Shipyard Pte Ltd ("<u>Jurong</u>") constructed or is constructing the Rigs in Singapore pursuant to construction contracts with each Debtor.  In the case of PetroRig I, "<u>Rig I</u>," assigned Hull No. 11-1087, was constructed pursuant to construction contract dated October 21, 2005 between Jurong and PetroRig I ("<u>Construction Contract I</u>").  In the case of PetroRig II, "<u>Rig II</u>," assigned Hull No. 11-1088, is being constructed pursuant to a construction contract dated March 23, 2006 between Jurong and PetroRig II ("<u>Construction Contract II</u>").  In the case of PetroRig III, "<u>Rig III</u>," assigned Hull No. 11-1089, is being constructed pursuant to a construction contract dated January 25, 2007 between Jurong and PetroRig III ("<u>Construction Contract III</u>," and collectively with Construction Contract II, the "<u>Construction Contracts</u>").

7.     Rig I has been sold by Jurong pursuant to a Court approved settlement, as set forth in more detail below.  The proceeds of the sale of Rig I and the Construction Contracts are the Debtors' principal assets.

8.     Rig II is scheduled for delivery on September 30, 2009 (although the possibility of delay is anticipated) and Rig III is scheduled for delivery on January 31, 2010 (although the possibility of delay is anticipated).

9.     Prior to the Petition Date, PetroRig I purchased, through Aker Kvaerner MH AS ("<u>Aker</u>"), 41 bare riser joints with auxiliary lines and buoyancy for 36 of the riser joints (the "<u>Risers</u>"), to use in connection with Rig I, and paid Aker for the Risers in full.  The Risers were designed specifically to guide the drill operated from Rig I to the ocean floor.  Upon information

and belief, the Risers are currently located in the Louisiana storage facility of Chet Morrison

Contractors.  Prior to the Petition Date, PetroRig I also purchased, and paid for in full, certain

equipment related to the operation of an ultra deepwater semi submersible harsh environment

drilling rig which relate to the operation of the Rigs (the "Rig Equipment").

      **C.**      **Delivery of Rig I, the Adversary Proceeding, and Settlement Regarding Construction Contract I and the Sale of Rig I**

      10.      On the Petition Date, PetroRig I commenced an adversary proceeding in this

Court against Jurong relating to Jurong's alleged breach of Construction Contract I with respect

to Rig I, Adversary Proceeding No. 09-01234.

      11.      Pursuant to the Order Authorizing and Approving Stipulation of Settlement and

Dismissal, signed and entered by the Court on June 4, 2009 (Dkt. No. 35), the Court authorized

the Stipulation of Settlement and Dismissal, providing for, among other things, Jurong's sale of

Rig I in a private sale conducted in Singapore, and the return of the excess proceeds of such sale,

net of certain agreed amounts owing from PetroRig I to Jurong, to PetroRig I's bankruptcy

estate.  Recently, Jurong completed the sale of Rig I and transferred the sale proceeds to

PetroRig I.

      **D.**      **Sale of Debtors' Assets**

      12.      In accordance with: (i) the Debtors' Motion for Entry of (a) an Order (i)

Approving Bidding Procedures for the Sale of Certain Assets, (ii) Scheduling Auction Date and

Sale Hearing Date on Shortened Notice, (iii) Approving the Form and Notice Thereof, and (iv)

Granting Related Relief; and (b) an Order (i) Authorizing the Sale of Certain Assets, (ii)

Authorizing the Assumption and Assignment of Certain Contracts, and (iii) Granting Related

Relief (the "Sale Motion"), and (ii) entry of the Order (I) Approving Bidding Procedures For The

Sale Of Certain Assets, (II) Scheduling Auction Date And Sale Hearing Date On Shortened

Notice, (III) Approving The Form And Notice Thereof, And (IV) Granting Related Relief (the "Procedures Order"), on September 10 2009, the Debtors obtained authority to conduct an auction for the purchase of all their right, title, and interest in Construction Contract II. Moreover, the Debtors have reserved their right to market Construction Contract III, and (a) seek the sale of Construction Contract III on expedited notice, along with Construction Contract II, or (b) continue to market Construction Contract III until November 15, 2009. The Debtors seek such relief because, among other reasons, PetroRig II and PetroRig III lack the funding to make the remaining payments due under the Construction Contracts. Moreover, the Debtors need to sell Construction Contract II as quickly as possible in order to avoid certain penalties and forfeiture under Construction Contract II, through an auction, in accordance with the Procedures Order.

13.     Following the auction and sale contemplated in the Sale Motion, the Debtors intend to seek the sale of Construction Contract III (to the extent it is not sold with Construction Contract II), the Risers, and the Rig Equipment (collectively, the "Additional Sale Assets," and together with Construction Contract II, the "Sale Assets").

### E.     The Proposed Retention of a Financial Advisor

14.     The Debtors require the services of a financial advisor, with experience in the Mobile Offshore Drilling Units (MODU) industry, to assist the Debtors in marketing and selling Construction Contract II, and later, the Additional Sale Assets. Such an advisor will benefit the Debtors' estates by providing (i) knowledge of the MODU industry, (ii) knowledge of various entities, primarily drilling contractors and operators, that may be interested in the Sale Assets, (iii) the financial expertise to assess bids, (iv) relevant knowledge and experience within the MODU industry relating to international shipyards and marine asset (ships) in general to conduct the requisite auction.

15.     Pursuant to section 327(a) of the Bankruptcy Code, the Debtors have selected DSM to serve as financial advisor to the Debtors, subject to approval by this Court.

### III.     RELIEF REQUESTED

16.     By this Application, the Debtors seek to retain DSM as their financial advisor, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code to perform financial advisory and consulting services for the Debtors in these chapter 11 cases, as more fully set forth in the financial advisor engagement agreement between the Debtors and DSM dated as of August 15, 2009, a copy of which is attached hereto as **Exhibit B** (the "Engagement Agreement"). The Debtors also seek approval of the terms of DSM's proposed employment, including the proposed compensation and indemnification provisions set forth in the Engagement Agreement.

17.     The Debtors require the services of DSM to, among other things, aid in the marketing of the Sale Assets, thereby maximizing the purchase price of the Sale Assets, to the benefit of the Debtors' estates and their creditors.

### IV.     THE QUALIFICATIONS OF DSM

18.     Headquartered in Greenwich, Connecticut, DSM is a portfolio company of First Reserve Corporation with a mandate to build a full service tanker transportation company. Peter Ekvall ("Mr. Ekvall"), the Vice President – Commercial with DSM will be leading the engagement. Prior to joining DSM, Mr. Ekvall worked as a shipbroker, an offshore broker and a new building (yard) broker, and has extensive experience in selling second hand tonnage, offshore equipment and negotiating construction contracts for new equipment with ship yards around the world. From October 1997 to June 2003, he was engaged at Maverick Offshore in Houston, Texas working specifically in the offshore industry, focusing on sale, new construction and employment of MODU equipment as well as Floating Production Storage and Offtake (FPSO) equipment. Mr. Ekvall has been specifically focused towards the high end floating

marine equipment including shipping, drilling and production FPSO equipment.

19.     The resources, capabilities and experience of DSM and Mr. Ekvall are crucial to the Debtors' successful restructuring and maximizing recoveries for their creditors.  An experienced financial advisor such as DSM fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals.  Broadly speaking, DSM will concentrate its efforts on analyzing strategies to maximize the sale of the Sale Assets, soliciting bids for the Sale Assets, negotiating with potential purchasers, assessing bids received for the Sale Assets and determining the proper valuation of the Sale Assets.  For these reasons, the Debtors require the services of a capable and experienced financial firm such as DSM.

20.     The compensation arrangement provided for in the Engagement Agreement is consistent with and typical of arrangements entered into by DSM and other financial advisory firms of comparable standing in connection with rendering similar services to clients such as the Debtors.

21.     The Debtors believe that DSM is well qualified and able to represent their interests in a cost-effective, efficient and timely manner.  DSM has indicated its willingness to act on behalf of the Debtors and to subject itself to the jurisdiction and supervision of this Court.

## V.     SCOPE OF SERVICES

22.     DSM and the Debtors have entered into the Engagement Agreement, which governs the Debtors' relationship with DSM.  The terms and conditions of the Engagement Agreement were negotiated between the Debtors and DSM at arm's length, and they reflect the parties' mutual agreement as to the substantial efforts that will be required in this engagement. Under the Engagement Agreement, DSM will provide such financial advisory services as reasonably requested by the Debtors in order to assist the Debtors in marketing the Sale Assets and to advise the Debtors in connection with the related bidding, auction, and sale of the Sale

Assets. The financial advisory services (the "Services") to be provided by DSM include but are not limited to the following:

(a) meeting with the Debtors' board of directors to ascertain their goals, objectives and financial parameters with respect to the sale (the "Sale") of the Sale Assets;

(b) developing a marketing strategy for the Sale and implementing the marketing strategy after it is has been approved by the Debtors' board of directors and agents;

(c) soliciting bids for the Sale Assets, including developing a list of, and contacting potential purchasers of the Sale Assets;

(d) assessing bids received for the Sale Assets;

(e) reporting periodically to the Debtors, and participating in conference calls and other periodic calls and meetings with the Debtors and their agents, regarding the status of the marketing efforts and the solicitation of bids;

(f) coordinating, organizing and directing the due diligence review, bidding, auction and sale processes, in order to maximize the attendance of all potential purchasers of the Sale Assets; and

(g) providing such other services as requested by the Debtors from time to time.

23. The Services that DSM will provide to the Debtors are necessary to enable the Debtors to maximize the value of their estates. The Debtors believe that the Services will not duplicate the services provided by the other professionals that the Debtors have retained in these cases. Specifically, DSM will carry out unique functions and the Debtors will use reasonable efforts to coordinate DSM's Services with the Debtors' other retained professionals to avoid unnecessary duplication of services. DSM will not act in any capacity other than as described herein as a financial advisor to facilitate the sale of the Sale Assets pursuant to Bankruptcy Code section 327. In addition, DSM will file with the Court, with copies to the United States Trustee and the Official Committee of Unsecured Creditors, a report of staffing on the engagement for each previous month, during the term of the engagement.

24. The Debtors hereby request that the Court approve DSM's retention *nunc pro*

*tunc*, to August 15, 2009.  This is appropriate because, since that date, DSM has been providing services to the Debtors, including participating in conference calls and strategy sessions regarding the Sale Assets.

25.     The Debtors are also exploring the possibility of retaining professionals to provide legal entity and bankruptcy-related accounting and tax services.  DSM does not have the necessary accounting and tax expertise to provide such services.  To the extent that DSM's scope of services may overlap with any other of the Debtors' professionals, each party, through the Debtors counsel, will carefully coordinate to avoid any unnecessary duplication in efforts.

## VI.     TERMS OF RETENTION AND COMPENSATION

26.     As set forth in greater detail in the Engagement Agreement, the Debtors and DSM have agreed to the following compensation in consideration for the Services to be rendered by DSM in these chapter 11 cases, subject to the approval of this Court:[3]

a.      Monthly Advisory Fee.  A monthly advisory fee of $30,000.00[4] for each month of DSM's engagement hereunder (the "Monthly Advisory Fee").

b.      In addition to the fees described above, DSM will be entitled to reimbursement from the Debtors for all reasonable out-of-pocket expenses incurred by DSM in connection with its performances of services described above including reasonable expenses of travel and transportation, including, the cost of out-of-town travel, long distance telephone charges, court attendance, and postage and courier/overnight express fees.

27.     The compensation described above is comparable to compensation generally charged by financial advisory firms of similar stature to DSM for comparable engagements both

---

[3] To the extent there is any discrepancy between the terms contained herein and those set forth in the Engagement Agreement, the terms of the Engagement Agreement shall control.

[4] The Monthly Advisory Fee will be allocated between the estates of PetroRig II and PetroRig III.

in and out of bankruptcy.  The Debtors and DSM believe that the foregoing compensation arrangements are both consistent with the market and reasonable.

28.     The Debtors acknowledge and agree that DSM's expertise in the MODU industry, as well as its financial advisory capabilities, which will be required during the term of the DSM engagement, were important factors in determining the compensation for DSM, and that the ultimate benefit to the Debtors of DSM's Services likely could not be measured merely by reference to the number of hours to be expended by DSM's professionals in the performance of such services.  The Debtors also submit that the compensation set forth in the Engagement Agreement is reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

29.     As part of the overall compensation payable to DSM under the terms of the Engagement Agreement, the Debtors have agreed to indemnify DSM as described in the Engagement Agreement.  Both the Debtors and DSM believe that such indemnification provisions are customary and reasonable for financial advisory engagements in chapter 11 cases.

30.     As set forth in the Ekvall Declaration, DSM has not shared or agreed to share any of its compensation provided hereunder with any other person, other than other principals and employees of DSM, as permitted by section 504 of the Bankruptcy Code.

31.     The term of the Engagement Agreement shall expire on the earlier of the closing of (x) the sale(s) of all of the Sale Assets or (y) March 31, 2010, provided that (i) DSM may terminate the Engagement Agreement for cause upon fourteen (14) days prior written notice to the Debtors, and (ii) the Debtors may terminate the Engagement Agreement for any reason or no reason upon seven (7) days prior written notice to DSM.

## VII.     DSM'S DISINTERESTEDNESS

32.     To the best of the Debtors' knowledge, and except as disclosed in the Ekvall Declaration, DSM is a "disinterested person" as the term is defined in Bankruptcy Code

section 101(14) and modified by Bankruptcy Code section 1107(b). DSM does not have any conflict of interest nor does DSM currently represent or hold any interest adverse to the Debtors, their equity holders, the Debtors' estates, the Debtors' current or former officers and directors, the Debtors' creditors, and prospective buyers of the Sale Assets in the matters upon which DSM is to be engaged, as set forth in detail in the Ekvall Declaration. Furthermore, DSM did not have any prepetition role in the management of the Debtors as an officer, director, employee or consultant, and DSM was not involved in the decision to engage the services of DSM in these bankruptcy cases.

33.     DSM will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new material facts or relationships are discovered, DSM will supplement its disclosure to the Court.

34.     The Debtors do not owe DSM any amount for services performed or expenses incurred prior to the Petition Date, and DSM is consequently not a prepetition creditor of the Debtors. Furthermore, DSM will not make any investments in the Debtors or the reorganized Debtors for a period of at least three years after the conclusion of DSM's engagement in these bankruptcy cases.

## VIII.     BASIS FOR RELIEF

35.     The Debtors request approval of the terms of DSM's engagement, including the terms of the Engagement Agreement, subject to the standard of review provided in section 328(a) of the Bankruptcy Code. Section 328(a) of the Bankruptcy Code provides, in relevant part, that a debtor "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including a retainer, on an hourly basis, or on a contingent fee basis."

36.     As recognized by numerous courts, Congress intended in section 328(a) to enable

debtors to retain professionals pursuant to specific fee arrangements to be determined at the time

of the court's approval of the retention, subject to reversal only if the terms are found to be

improvident in light of "developments not capable of being anticipated at the time of the fixing

of such terms and conditions." 11 U.S.C. § 328(a); *see Donaldson, Lufkin & Jenrette Sec. Corp.*

*v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862-863 (5th Cir. 1997) ("If the

most competent professionals are to be available for complicated capital restructuring and the

development of successful corporate reorganization, they must know what they will receive for

their expertise and commitment").

37.     The Debtors believe that the monthly fee structure and indemnification provisions

set forth in the Engagement Agreement are reasonable terms and conditions of employment and

should be approved under section 328(a) of the Bankruptcy Code. The monthly fee structure and

indemnification provisions are consistent with normal and customary billing practices for cases

of this size and complexity that require the level and scope of services outlined.

38.     DSM will file with the Court quarterly reports of services provided, the

compensation earned by each individual, and an itemization of the expenses incurred. DSM will

also provide notice of the quarterly reports to the United States Trustee and the Official

Committee of Unsecured Creditors. Each quarterly report will provide a time period for

objections, and all compensation shall be subject to review by the Court only in the event an

objection is filed. The United States Trustee will have the right to a review of the fees incurred

by DSM and payments made thereto for substantial contribution to the Debtors' estates pursuant

to section 330 of the Bankruptcy Code.

### A.     Indemnification Provisions

39.     As more fully described in the Engagement Agreement, if the Application is

granted, the Debtors will be obligated to indemnify and hold DSM harmless against any and all

losses, claims, damages, liabilities and expenses incurred by DSM, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with the negotiation, execution and/or rendering of services by DSM, unless such losses, claims, damages, liabilities and expenses resulted from the gross negligence or willful misconduct of DSM.

40. The indemnification provisions reflected in the Engagement Agreement are a customary and reasonable term of consideration for financial advisors such as DSM for proceedings both out-of-court and in chapter 11.

41. The indemnification procedures reflected in the attached order are similar to indemnification procedures that were negotiated with the Office of the U.S. Trustee and approved by courts in this District and in other jurisdictions. *See, e.g. In re Acterna*, Case No. 03-12837 (Bankr. S.D.N.Y., June 24, 2003); *In re Spiegel*, Case No. 03-11540 (Bankr. S.D.N.Y., May 25, 2005); *In re Halpern*, 248 B.R. 43, 45-46 (Bankr. S.D.N.Y. 2000); *In re LTV Steel Co., Inc.*, 2001 U.S. Dist. LEXIS 25338 (N.D. Ohio Nov. 14, 2001); *In re Pittsburgh-Canfield Corp.*, Case Nos. 00-43394 through 0043402 (WTB) (Bankr. N.D. Ohio Dec. 12, 2000); *In re United Artists Theatre Co.*, 315 F.3d 217, 232 (3d Cir. 2003); *In re Exide Techs.*, Case No. 02-11125 (JCA) (Bankr. D. Del. Aug. 21, 2002).

42. The Debtors respectfully submit that the indemnification provisions contained in the Engagement Agreement, viewed in conjunction with the other terms of DSM's proposed retention, are reasonable and in the best interests of the Debtors, their estates and creditors.

## IX.     WAIVER OF MEMORANDUM OF LAW

43. Because the relevant facts and law are detailed herein, the Debtors respectfully request that the Court waive the requirement that the Debtors file a separate memorandum of law in support of the Application.

## X.     NOTICE

44.     The Debtors have provided notice of this Application to: (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the Committee; (c) the trustee for the Debtors' secured noteholders; (d) Seadrill Deepwater Units Pte Ltd; (e) Jurong Shipyard Pte Ltd; (f) PetroMena, ASA; (g) PetroMena, Ltd.; (h) Lloyds TSB Bank plc; (i) Aker Kvaerner MH AS; (j) Chet Morrison Contractors; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; and (m) all parties having filed notices of appearances in these cases.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## XI.     NO PRIOR REQUEST

45.     No prior application for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto as **Exhibit C**, authorizing the Debtors to retain DSM as their financial advisor in these cases for the purposes set forth above, and providing the Debtors such other and further relief as the Court may deem just, proper and equitable.

New York, New York                     Respectfully submitted,
Dated:  September 16, 2009

                                       AKIN GUMP STRAUSS HAUER & FELD LLP

                                       */s/ Ira S. Dizengoff*
                                       Ira S. Dizengoff (ID-9980)
                                       David H. Botter (DB-2300)
                                       Kenneth A. Davis (KD-9070)
                                       AKIN GUMP STRAUSS HAUER & FELD LLP
                                       One Bryant Park
                                       New York, NY 10036
                                       (212) 872-1000 (Telephone)
                                       (212) 872-1002 (Facsimile)


                                       Attorneys for the Debtors and Debtors in
                                       Possession

**EXHIBIT A**

**DECLARATION OF PETER K. EKVALL**

Ira S. Dizengoff (ID-9980)
David H. Botter (DB-2300)
Kenneth A. Davis (KD-9070)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Attorneys for the Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                          :      Chapter 11
                                                :
PETRORIG I PTE LTD, et al.,                     :      Case No. 09-13083 (JMP)
                                                :
                                                :
                        Debtors.[1]             :      (Jointly Administered)
                                                :
                                                :
                                                :
-------------------------------------------------------------x

## DECLARATION OF PETER K. EKVALL IN SUPPORT OF THE APPLICATION PURSUANT TO BANKRUPTCY RULE 2014(a) FOR ENTRY OF AN ORDER UNDER SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE AUTHORIZING THE EMPLOYMENT AND RETENTION OF DIAMOND S. MANAGEMENT AS FINANCIAL ADVISOR TO THE DEBTORS NUNC PRO TUNC TO AUGUST 15, 2009

I, Peter K. Ekvall, hereby declare:

    1.      I am the Vice President – Commercial with Diamond S. Management

("DSM").  DSM is a portfolio company of First Reserve Corporation with a mandate to build a

full service tanker transportation company.  DSM is headquartered in Greenwich, Connecticut.

---

[1] The Debtors are PetroRig I Pte Ltd ("PetroRig I"), PetroRig II Pte Ltd ("PetroRig II") and PetroRig III Pte Ltd ("PetroRig III").  The Debtors' cases are jointly administered under the lead case of PetroRig I pursuant to an order dated May 20, 2009 (Dkt. No. 13).  The case number for PetroRig II is 09-13084 and the case number for PetroRig III is 09-13085.

6392104

Prior to joining DSM, I have been employed as a shipbroker, offshore broker and newbuilding (yard) broker and I have extensive experience in selling second hand tonnage, offshore equipment and negotiating construction contracts for new equipment with ship yards around the world.

2.      I submit this affidavit (the "Affidavit") on behalf of DSM in support of the application (the "Application") pursuant to Bankruptcy Rule 2014(a) for entry of an order under sections 327(a) and 328(a) of the Bankruptcy Code authorizing the employment and retention of DSM as financial advisor to PetroRig II Pte Ltd. and PetroRig III Pte Ltd (the "Debtors") *nunc pro tunc* to August 15, 2009.

3.      Unless otherwise defined, all capitalized terms used herein shall have the meanings given to them in the Application.

4.      The facts set forth in this Affidavit are based upon my personal knowledge, upon information and belief, and upon client matter records kept in the ordinary course of business that were reviewed by me or other employees of DSM under my supervision and direction. The procedures pursuant to which DSM determined whether there were any connections between DSM and interested parties in these cases is described below. The results of that investigation are set forth herein and in **Exhibit 2** appended hereto.

### Services to be Rendered

5.      DSM has agreed to provide financial advisory services to the Debtors in connection with these chapter 11 cases, upon approval by the Court, including but not limited to the following:

(a)      meeting with Debtors' boards of directors and agents to ascertain their goals, objectives and financial parameters with respect to the Sale of the Sale Assets;

(b)     developing a marketing strategy for the Sale and implementing the marketing strategy after it is has been approved by the Debtors' boards of directors and agents;

(c)     soliciting bids for the Sale Assets, including developing a list of, and contacting potential purchasers of the Sale Assets;

(d)     assessing bids received for the Sale Assets;

(e)     reporting periodically to the Debtors, and participating in conference calls and other periodic calls and meetings with the Debtors and their agents, regarding the status of the marketing efforts and the solicitation of bids;

(f)     coordinating, organizing and directing the due diligence review, bidding, auction and sale processes, in order to maximize the attendance of all potential purchasers of the Sale Assets; and

(g)     providing such other services as requested by the Debtors from time to time.

6.     Since August 15, 2009, DSM has been providing services to the Debtors, including participating in conference calls and strategy sessions regarding the Sale Assets.

## Professional Compensation

7.     Subject to Court approval and in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, applicable U.S. Trustee guidelines, the local rules of this District, and applicable orders of the Court, DSM has agreed to provide the services set forth in paragraph 4 above to the Debtors and to charge a flat monthly fee of $30,000.00.

8.     In addition to the fixed monthly fee set forth above, the Debtors shall reimburse DSM for all reasonable out-of-pocket expenses incurred by DSM in connection with its performance of the services set forth in paragraph 5 above. DSM's direct expenses shall include, but not be limited to, reasonable expenses of travel and transportation, including, the cost of out-of-town travel, long distance telephone charges, court attendance, and postage and courier/overnight express fees.

9.     The compensation arrangements provided herein are consistent with and typical of arrangements entered into by financial advisory firms with respect to comparable services for clients similar to the Debtors, both in and outside bankruptcy.

### Disinterestedness and Eligibility

10.     In connection with the preparation of this Affidavit, DSM conducted a review of its contacts with the names set forth on **Exhibit 1** to this Affidavit. DSM's review, completed under my supervision, consisted of a query of the **Exhibit 1** parties within an internal computer database containing names of individuals and entities that are present or recent former clients of DSM. Based on the results of its review, DSM does not have a relationship with any of the parties on **Exhibit 1** in matters related to these proceedings or any matters unrelated to these proceedings.

11.     Except as disclosed and waived above, DSM is not believed to be a "creditor" with respect to fees and expenses of any of the Debtors within the meaning of section 101(10) of title 11 of the United States Code (the "Bankruptcy Code"). Further, neither I nor any other member of the DSM engagement team serving the Debtors, to the best of my knowledge, is a holder of any outstanding debt instruments or shares of the Debtors' stock.

12.     To the best of my knowledge, information and belief, neither the undersigned nor the DSM professionals expected to assist the Debtors in these matters are connected to the Judge, U.S. Trustee or Assistant U.S. Trustee assigned to these cases.

13.     As such, to the best of my knowledge, DSM does not have any conflict of interest nor does DSM currently represent or hold any interest adverse to the Debtors, their equity holders, the Debtors' estates, the Debtors' current or former officers and directors, the Debtors' creditors, and prospective buyers of the Sale Assets in the matters upon which DSM is to be engaged. Furthermore, DSM did not have any prepetition role in the management of the

Debtors as an officer, director, employee or consultant, and DSM was not involved in the decision to engage the services of DSM in these bankruptcy cases. Therefore, I believe DSM is eligible to represent the Debtors.

14. It is DSM's policy and intent to update and expand its ongoing relationship search for additional parties in interest in an expedient manner. If any new material relevant facts or relationships are discovered or arise, DSM will promptly file a Bankruptcy Rule 2014(a) Supplemental Affidavit.

15. Based on the foregoing, I believe that DSM is disinterested as defined in section 101(14) of the Bankruptcy Code and does not hold or represent an interest adverse to the Debtors or their estates.

16. According to DSM's books and records, during the ninety (90) day period prior to the Debtors' petition date, DSM performed no professional services or incurred any reimbursable expenses on behalf of the Debtors.

17. To the best of my knowledge, (a) no commitments have been made or received by DSM with respect to compensation or payment in connection with these cases other than in accordance with the provisions of the Bankruptcy Code, and (b) DSM has no agreement with any other entity to share with such entity any compensation received by DSM in connection with these chapter 11 cases except principals and employees of DSM.

18. I declare under the penalty of perjury that the foregoing is true and correct.

Executed on __Sep, 14TH__ 2009.

Peter K. Ekvall

# EXHIBIT 1

## LIST OF DEBTORS,
## CREDITORS, OTHER PARTIES IN INTEREST AND THEIR
## RESPECTIVE ATTORNEYS AND ACCOUNTANTS SEARCHED IN DSM'S
## COMPUTERIZED CONFLICTS DATABASE

**The Debtors**
PetroRig I Pte Ltd
PetroRig II Pte Ltd
PetroRig III Pte Ltd

**Debtors' Directors**
Eugene Davis
Tim Bernlohr
Richard Hancock

**Official Committee of Unsecured Creditors**
Anchor Marine Supplies Pte Ltd
Cameron International Corporation
Chuan Huat International
Larsen Oil and Gas Ltd.
RS Components Pte Ltd

**Other Adverse Parties**
Aker MH AS
Jurong Shipyard Pte Ltd
Lars Moldestad
Larsen Oil & Gas
Norsk Tillitsmann ASA
PetroMena ASA
PetroMena Limited
Robert Meggy

**Other Parties**
Alex Monsen
Bob Dawson
Chett Morrison Contractors, Inc.
Ellipse Energy Pte. Ltd.
Lloyds Bank
Florence Ong
Pemex
PIRINATE Consulting Group
Seadrill Deepwater Units Pte Ltd
Seadrill Management ASA
TJB Management Consulting, LLC

**Creditors of PetroRig I Pte Ltd, PetroRig II Pte Ltd and PetroRig III Pte Ltd**

ABB AS
Advokatfirmaet Steensntrup Stordrange DA
Aker MH (Singapore) Pte Ltd
Anson Oilfield Equipment Private Ltd
Aqua-Terra Oilfield Equipment & Services Pte Ltd
Atech Marine & Offshore Pte Ltd
BMT Fluid Mechanics Ltd
Boon Lay Stationary Pte Ltd
Cameron
Capital International AS
Ce-Test & Measurement (S) Pte Ltd
Chee Fatt Co Pte Ltd
Chuan Huat International Pte Ltd
Connector Specialist Inc/CSI Inc
COR International Ltd.
Crystal Offshore Pte. Ltd.
D Squared Technology Pte Ltd
Draeger Safety Asia Pte Ltd
Drew Marine, Div. of Ashland
Echem Instruments Pte Ltd
Energy Equipment Services Pte Ltd
Engineering & Marine Services Pte Ltd
Eutex (Asia) Pte Ltd
Flowlink Engineering Pte Ltd
Forum Oilfield Asia Pacific Pte Ltd
Franklin Offshore International Pte Ltd
Gaylin International Pte Ltd
Hadco
Infrared Camera Inc.
Innocom Technologies Pte Ltd
Jason Electronics (Pte) Ltd
Kongsberg Maritime AS
Larsen Oil & Gas FZCO, Dubai - UAE
Larsen Oil & Gas Pte Ltd
Larsen Oil and Gas Ltd
Lor Engineering Oilfield Services Pte Ltd
Marine Accomm Pte Ltd
Marking Services Inc. (S) Pte Ltd
Micro 2000 Technology Pte Ltd
Mid-Continent Equipment Group Pte Ltd
ModuSpec Engineering Asia Pacific Pte Ltd
MTQ Engineering Ptd Ltd.
Norsk Tillitsmann ASA
Oceanic Offshore Engineering Pte Ltd
ODL Inc.

Oncor Trading, Inc.
Oregon Prime Marketing (Int'l) Pte td
Pacific Petroleum Pte Ltd
Pemac Pte Ltd
Petracarbon Pte Ltd
Petrolia Drilling ASA
PetroMENA ASA
Premier Sea & Land Pte Ltd
Progressive Systems & Engineering Pte Ltd
Radiant International Pte. Ltd.
RMG Travel Ptd ltd
Rotra Chemicals Pte Ltd
San Seng National Plastic Pte Ltd
Sanda Marketing Services
Scana Offshore Services Singapore Pte Ltd
SDV Logistics (Singapore) Pte Ltd
Seaflex AS
Semco Maritime
Singapore Valve & Fitting Pte Ltd
Southland Rental Tools, Inc.
Stress Engineering Services, Inc.
Svitzer Ocean Towage BV
Torq/Lite, Inc.
Uniweld Products (USA) Pte Ltd
Viking Airtech Pte Ltd
W.W. Grainger Inc.
Wholesome (S) Pte Ltd
Wilhelmsen Ship Service

## Parties Who Filed Notices of Appearance:

Aker MH AS
Cameron International Corp.
Crystal Offshore Pte. Ltd.
Energy Equipment Services Pte Ltd.
Larsen Oil & Gas Ltd.
Wilhelmsen Ships Service

**EXHIBIT B**

**ENGAGEMENT AGREEMENT**

# FINANCIAL ADVISOR ENGAGEMENT AGREEMENT

This Agreement, dated as of August 15, 2009, is made between Debtors PetroRig I Pte Ltd ("PetroRig I"), PetroRig II Pte Ltd ("PetroRig II") and PetroRig III Pte Ltd ("PetroRig III", and collectively with PetroRig I and PetroRig II, the "Debtors") and Diamond S. Management LLC (the "Advisor").

## W I T N E S S E T H :

**WHEREAS**, the Debtors are operating their businesses as debtors in possession in chapter 11 cases styled *In re PetroRig I Pte Ltd*, No. 09-13083, *In re PetroRig II Pte Ltd*, No. 09-13084 and *In re PetroRig III Pte Ltd*, No. 09-13085, which are pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, the Debtors desire to engage the Advisor, subject to the entry of an order (the "Order") of the Bankruptcy Court authorizing such engagement and the Debtors' entry into this Agreement, to act as the Debtors' financial advisor in connection with the sale (the "Sale") of certain sale assets which consist of the following (collectively, the "Sale Assets"):

      (a)     All of PetroRig II's right, title and interest in and to a construction contract for one (1) new ultra deepwater semi submersible harsh environment drilling rig, assigned Hull No. 11-1088, dated March 23, 2005, between PetroRig II and Jurong Shipyard Pte Ltd in Singapore ("Jurong"),

      (b)     All of PetroRig III's right, title and interest in and to a construction contract for one (1) new ultra deepwater semi submersible harsh environment drilling rig, assigned Hull No. 11-1089, dated January 25, 2007, between PetroRig III and Jurong,

      (c)     All of PetroRig I's right, title and interest in and to 41 bare riser joints with auxiliary lines and buoyancy for 36 of the riser joints to be used in connection with, among other things, an ultra deepwater semi submersible harsh environment drilling rig, and

      (d)     All of the Debtors' right, title and interest in and to certain excess equipment related to the operation of ultra deepwater semi submersible harsh environment drilling rigs,

in the manner and subject to the terms and conditions set forth herein and in accordance with other applicable provisions of title 11 of the United State Code (the "Bankruptcy Code");

**WHEREAS**, the Advisor desires to be engaged by the Debtors to act as the Debtors' financial advisor in connection with the Sale, in the manner and subject to the terms and conditions set forth herein and in accordance with other applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

8196560

## 1. Services to be Rendered

The Advisor shall act as financial advisor to the Debtors in connection with the Sale, which will include, without limitation, the following duties:

a) meeting with Debtors' boards of directors and agents to ascertain their goals, objectives and financial parameters with respect to the Sale;

b) developing a marketing strategy for the Sale and implementing the marketing strategy after it is has been approved by the Debtors' boards of directors and agents;

c) soliciting bids for the Sale Assets, including developing a list of, and reaching out to, potential purchasers of the Sale Assets;

d) assessing bids received for the Sale Assets;

e) reporting periodically to the Debtors, and participating in conference calls and other periodic calls and meetings with the Debtors and their agents, regarding the status of the marketing efforts and the solicitation of bids;

f) coordinating, organizing and directing the due diligence review, bidding, auction and sale processes, in order to maximize the attendance of all potential purchasers of the Sale Assets; and

g) providing such other services as requested by the Debtors from time to time.

## 2. Compensation

(a)  In consideration of the Advisor's services hereunder, the Advisor shall be paid an advisory fee of $30,000.00 per month for the duration of the Term, as defined below (the "Compensation").  The Advisor shall not be entitled to any other commission or fees upon the successful sale of the Sale Assets.

(b)  The Advisor will maintain detailed reports of compensation earned and expenses incurred on at least a quarterly basis.  Such reports shall summarize the services provided, identify the compensation earned by each employee of the Advisor, and itemize the expenses incurred.

## 3. The Advisor's Expenses

The Advisor shall be entitled to reimbursement from the Debtors for all Reimbursable Expenses (defined below). "Reimbursable Expenses" means all reasonable out-of-pocket expenses incurred by the Advisor in connection with its performance of the services hereunder. Reimbursable Expenses shall include, without limitation, reasonable expenses of coach travel (domestic) and business class travel for international travel, if any, and

transportation, including, the cost of out-of-town travel, long distance telephone charges, court attendance, and postage and courier/overnight express fees. The Advisor shall not be responsible for any transactional costs and/or legal expenses incurred by the Debtors in connection with their retention of the Advisor and their involvement with the subject matter of this Agreement.

## 4.    Term of Engagement and Termination

(a)    Subject to the entry of the Order, the term of this Agreement shall commence as of the date hereof and shall expire on the earlier of the closing of (x) the sale(s) of all of the Sale Assets or (y) March 31, 2010, provided that (i) the Advisor may terminate this Agreement for cause upon fourteen (14) days prior written notice to the Debtors, and (ii) the Debtors may terminate this Agreement for any reason or no reason upon seven (7) days prior written notice to the Advisor, each without prejudice to the Advisor's rights to receive payment of all the Compensation and the Reimbursable Expenses then due and owing.

(b)    Sections 3, 5-7, and 9-18 hereof shall survive any termination of this Agreement.

## 5.    Indemnification

(a)    Indemnification by the Debtors. The Debtors shall indemnify the Advisor and hold it harmless against any and all losses, claims, damages, liabilities and expenses incurred by the Advisor, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with the negotiation, execution and/or rendering of services by the Advisor hereunder, unless such losses, claims, damages, liabilities and expenses resulted from the gross negligence or willful misconduct of the Advisor.

(b)    Indemnification by the Advisor. The Advisor shall indemnify the Debtors, their directors and attorneys, and hold the foregoing entities and persons harmless against any and all losses, claims, damages, liabilities and expenses incurred by the Debtors, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with the gross negligence or willful misconduct of the Advisor in the negotiation, execution and/or rendering of services by the Advisor hereunder.

## 6.    Best Efforts and Cooperation

(a)    In consideration of this Agreement, the Advisor agrees to utilize commercially reasonable efforts and diligence to achieve the purpose of this Agreement. The Debtors shall furnish the Advisor with all information, data or documents that the Advisor shall reasonably deem appropriate in connection with its activities hereunder and shall provide the Advisor full access to the Debtors' directors and professional advisors.

(b)    It is further understood that the Debtors shall involve the Advisor in all discussions between the Debtors and potential purchasers and shall make available to the Advisor all information regarding potential purchasers that it shall receive from any source whatsoever.

## 7.   Confidentiality

The Advisor agrees that all confidential information which it may now possess or may obtain relating to the Debtors shall not be published, disclosed or made accessible by it to any other person or any entity at any time or used by it without the prior written consent of the Debtors; provided that the restrictions of this sentence shall not apply (i) as may otherwise be required by law, (ii) as may be necessary or appropriate in connection with this Agreement, or (iii) to the extent such information shall be or shall have otherwise become publicly available.

## 8.   Bankruptcy Court Approval

(a)   Retention Application.  The Debtors shall promptly apply to the Bankruptcy Court for entry of the Order.  In connection with such application, the Debtors will request authority to pay the Advisor the Compensation and Reimbursable Expenses set forth in this Agreement as they come due subject to review by the Bankruptcy Court.

(b)   Effectiveness of this Agreement.  The effectiveness of this Agreement is subject to and contingent upon the entry of the Order, which the Debtors agree to use commercially reasonable efforts to obtain.  The Debtors will provide the Advisor with copies of the pleadings requesting retention of the Advisor prior to submission to the Bankruptcy Court and advise the Advisor of any objection or hearings pertaining to the Advisor's retention.  The Advisor shall provide the Debtors with any and all information and documentation necessary or appropriate for its retention by the Debtors.  The parties acknowledge that this Agreement in its entirety will be attached to, and made a part of, Debtors' application to the Bankruptcy Court and will be incorporated by reference in the Order authorizing the Advisor's retention.

## 9.   Notices

All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given as follows.

All notices to the Debtors shall be delivered as follows:

Akin, Gump, Strauss, Hauer & Feld LLP
Attn:  Ira S. Dizengoff and David H. Botter
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

All notices to the Advisor shall be delivered as follows:

Diamond S. Management LLC
Attn:  Peter K. Ekvall
165 Mason Street, 2nd Fl.
Greenwich, CT 06830

## 10.   Amendments and Waivers

(a)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)    No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

## 11.    Successors and Assigns

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto.

## 12.    Governing Law

This Agreement shall be governed and construed in accordance with the laws of the State of New York without giving effect to the choice of law or conflict of law principles hereof, and venue shall be the Bankruptcy Court.

## 13.    Jurisdiction and Venue

Except as otherwise expressly provided in this Agreement, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each party agrees that service of process on such party as provided in the Notices section of this Agreement shall be deemed effective service of process on such party.

## 14.    Third Party Beneficiaries

This Agreement is intended solely for the benefit of the parties hereto and shall not be deemed or interpreted to confer any rights upon any third parties.

## 15. Counterparts

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.

## 16. Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written between the parties with respect to the subject matter of this Agreement.

## 17. Severability

The provisions of this Agreement shall be severable in the event that any of the provisions hereof are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law; provided that if any provision of this Agreement, as applied to any party or to any circumstance, is judicially determined not to be enforceable in accordance with its terms, the parties hereby agree that the court judicially making such determination may modify the provision in a manner consistent with its objectives such that it is enforceable, and/or delete specific words or phrases, and in its modified form, such provision will then be enforceable and will be enforced.

## 18.    Captions, Headings, Interpretations

The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disbarring any party by virtue of authorship of any provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized directors or officers as of the day and year first above written.

PETRORIG I PTE LTD

By:_____
    Name: Timothy J Bernlohr
    Title: Director

PETRORIG II PTE LTD

By:_____
    Name: Timothy J. Bernlohr
    Title: Director

PETRORIG III PTE LTD

By:_____
    Name: Timothy J Bernlohr
    Title: Director

DIAMOND S. MANAGEMENT LLC

By:_____
    Name: Peter K. Ekvall
    Title: Vice President

8196560

7

**EXHIBIT C**

**PROPOSED ORDER**

Ira S. Dizengoff (ID-9980)
David H. Botter (DB-2300)
Kenneth A. Davis (KD-9070)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
In re:                                        :        Chapter 11
                                              :
PETRORIG I PTE LTD, <u>et al</u>.,            :        Case No. 09-13083 (JMP)
                                              :
                                              :
                              Debtors.        :        (Jointly Administered)
                                              :
                                              :
-------------------------------------------------------------x

**ORDER PURSUANT TO BANKRUPTCY RULE**
**2014(a) AND SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY**
**CODE AUTHORIZING THE EMPLOYMENT AND RETENTION OF**
**DIAMOND S. MANAGEMENT AS FINANCIAL ADVISOR TO**
**THE DEBTORS NUNC PRO TUNC TO AUGUST 15, 2009**

Upon consideration of the application (the "<u>Application</u>") of PetroRig II Pte Ltd

("<u>PetroRig II</u>") and PetroRig III Pte Ltd ("<u>PetroRig III</u>") (collectively, the "<u>Debtors</u>," and each

individually, a "<u>Debtor</u>"), pursuant to sections 327(a) and 328(a) of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>") and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the

"<u>Bankruptcy Rules</u>"), for the entry of an order authorizing the Debtors to retain and employ

Diamond S. Management ("<u>DSM</u>"), as financial advisor to the Debtors; and the Court having

jurisdiction to consider the Application; and the Court having considered the Application and the

Declaration of Peter K. Ekvall (the "<u>Ekvall Declaration</u>") in support of the Application; and

based upon the representations made in the Application and the Ekvall Declaration that DSM

does not hold or represent any interest adverse to the Debtors, their creditors, or any party-in-

interest, or their respective attorneys and is a "disinterested person" as that term is defined under

section 101(14) of the Bankruptcy Code, and that the employment of DSM is necessary and in

the best interest of the Debtors and their estates; and it appearing that due and adequate notice of

the Application has been given; and it appearing that no other notice need be given; and it

appearing that DSM is not representing any adverse interests in connection with these cases; and

it appearing that the compensation and terms of retention of DSM are reasonable; and it

appearing that the relief requested in the Application is in the best interest of the Debtors; after

due deliberation and sufficient cause appearing therefore, it is hereby

 **ORDERED** that the Application be, and it hereby is, GRANTED; and it is further

 **ORDERED** that the capitalized terms not defined herein shall have the meanings

ascribed to them in the Application; and it is further

 **ORDERED**, that pursuant to Bankruptcy Code sections 327(a), 328(a) and Federal Rule

of Bankruptcy Procedure 2014, the Debtors are hereby authorized and empowered to employ and

retain DSM as their financial advisor, *nunc pro tunc* to August 15, 2009, to provide financial

advisory services in connection with the sale of the Debtors' interests in the Sale Assets on the

terms set forth in the Engagement Agreement, and such retention is hereby approved; and it is

further

 **ORDERED**, that the United States Trustee will have the right to a review of the fees

incurred by DSM and payments made thereto for substantial contribution to the Debtors' estates

pursuant to section 330 of the Bankruptcy Code; and it is further

**ORDERED**, that the Debtors may execute any and all documentation necessary to employ and retain DSM; and it is further

**ORDERED**, that DSM shall be compensated in accordance with the Engagement Agreement; and it is further

**ORDERED**, that DSM shall file quarterly reports of the compensation earned by each individual and an itemization of the expenses incurred, and the Debtors shall provide notice to the United States Trustee and the Official Committee of Unsecured Creditors of the quarterly reports, and such notice shall provide a time period for objections; and it is further

**ORDERED**, that any objections filed shall be resolved by the Bankruptcy Court, and in the absence of any objections, DSM will be paid on a monthly basis pursuant to the terms of the Engagement Agreement; and it is further

**ORDERED**, that the Debtors, their officers, employees and agents, are authorized to take or refrain from taking such acts as are necessary and appropriate to implement and effectuate the relief granted herein; and it is further

**ORDERED**, that the requirement pursuant to Local Rule 9013-10(b) that the Debtors file a separate memorandum of law in support of the Application is waived;

**ORDERED**, that this Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

Dated: New York, New York
        _____, 2009.


                            _____
                            **UNITED STATES BANKRUPTCY JUDGE**