Christopher J. Battaglia, Esq.
Jocelyn Keynes, Esq.
HALPERIN BATTAGLIA RAICHT, LLP
555 Madison Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 765-9100
Facsimile: (212) 765-0964

*Counsel to the Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| PETRORIG I PTE. LTD., *et al.*, | : | Case No. 09-13083 (JMP) |
| Debtors. | : | Jointly Administered |

---------------------------------------------------------------x

**REPLY OF HALPERIN BATTAGLIA RAICHT, LLP,
COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
TO THE OBJECTION OF THE UNITED STATES TRUSTEE
<u>REGARDING APPLICATIONS FOR INTERIM COMPENSATION</u>**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

   Halperin Battaglia Raicht, LLP ("<u>HBR</u>" or "<u>Committee Counsel</u>"), counsel to the official committee of unsecured creditors (the "<u>Committee</u>"), herby submits this reply (the "<u>Reply</u>") to the objection of the United States Trustee (the "<u>US Trustee</u>") regarding applications for interim compensation (the "<u>UST Objection</u>") [Dkt. No. 440]; specifically, to the US Trustee's objection to HBR's third interim fee application (the "<u>HBR Application</u>") [Dkt. No. 431] requesting an allowance and payment of fees in the amount of $579,599.00 and reimbursement

of out-of-pocket expenses in the amount of $3,284.65 during the period from February 1, 2010 through May 31, 2010 (the "Compensation Period").[1]

In support of this Reply, HBR respectfully represents as follows:

**Preliminary Statement**

1. The UST Objection, quite frankly, leaves Committee Counsel confounded and perplexed. Essentially, the UST Objection bears no substantive resemblance to the realities of these cases. Additionally, Committee Counsel respectfully believes that if the UST Objection is sustained, it will further the administrative inefficiencies of the Bankruptcy process. If sustained, the UST Objection would have the effect of encouraging Committee Counsel to "shoot first and ask questions later" rather than pursuing a measured approach to discharging its fiduciary duties which are not necessarily reflected in the promulgation of potentially duplicative and unnecessary pleadings. Further, the seemingly arbitrary nature of the Objection's request for reduction promotes a potential inflation of such fees to account for the possibility of a knee-jerk standard for fee objections.

2. By its objection, the US Trustee fundamentally misunderstands and fails to appreciate the role of counsel to the official committee of unsecured creditors in these Chapter 11 cases. Since its retention, Committee Counsel has been intimately involved and a primary participant in all aspects of these cases, as well as the major impetus (in many instances behind the scenes) to certain strategies, processes and postures of these proceedings.

3. Accordingly, Committee Counsel finds it essential to set forth at the outset of its Reply that what is most evidently lost on the US Trustee is the undeniable fact that, due to

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the HBR Application.

Committee Counsel's prudent and measured restraint in dealing with (i) the asserted liens and claims of Norsk Tillitsmann ASA, trustee for the 9.75% and FRN Bondholders ("NT") and (ii) the claims of the Debtors' prepetition management (Larsen), coupled with Committee Counsel's strong-arm, proactivity in being (a) the architect of a potential global settlement and (b) the spearhead/intermediary for multiparty negotiations that has resulted in the stay of very costly litigation (and which will likely result in a fully consensual plan of reorganization that will provide a 100% dividend for unsecured creditors, as well as a substantial recovery for the Debtors' equity holders), Committee Counsel has saved, preserved and added more value to these Estates--for the benefit of *all* creditors, as well as equity--than it could ever attempt to be compensated for or obtain from the Estates.

4. Furthermore, it is unconscionable that the US Trustee has been receiving monthly fee statements and copies of Committee Counsel's time detail pursuant to the Order dated December 3, 2009 establishing procedures for monthly compensation and reimbursement of expenses of professionals retained by order of this Court (the "Procedures Order"), under which all parties are given an opportunity to review the retained professionals' time and object to any fees requested in these cases; yet, the US Trustee raised no objection and chose not to mention *any* of the issues listed in the UST Objection until now: three to six months after the US Trustee received and reviewed HBR's February through May invoices for the Compensation Period.

5. The US Trustee now boldly and apparently arbitrarily objects to $171,100.00 of the fees in HBR's February through May invoice--**almost 30% of its fees**--prompting the need for Committee Counsel to expend additional time and incur fees drafting and filing a written response and defending the HBR Application in a contested hearing before the Court.

6. As and for its objection, the US Trustee cites (a) unnecessary and unreasonable duplication of efforts; (b) vague services and "lumped" time entries; (c) travel time; and (d) staffing inefficiencies. As discussed in more detail, and for all the reasons set forth below, the UST Objection, as it pertains to HBR, should be overruled because HBR's fees are reasonable and should not be reduced, except as to the reductions accepted herein.

### HBR'S Reply

7. With respect to the level of compensation, section 330 of the Bankruptcy Code provides, in pertinent part, that the Court may award reasonable compensation to professionals for actual necessary services rendered based upon consideration of all relevant factors, including time spent, rates charged, necessity or benefit of services rendered, reasonableness of time spent and cost of comparable services other than in a bankruptcy case. *See* 11 U.S.C. § 330(a). The clear Congressional intent and policy expressed in this section is to provide for adequate compensation in order to continue to attract qualified and competent practitioners to bankruptcy cases. HBR respectfully submits that the fees sought during the Compensation Period are more than reasonable given the issues confronted and the work performed. HBR professionals rendered substantial, yet cost effective, services that were necessary to address issues in these cases that involved the Committee, its unsecured creditors and the potential recoveries by creditors.[2]

---

[2] On average, HBR professionals' hourly rates are 25%-30% lower than other retained professionals in these cases. It is also worth noting at this juncture that Committee Counsel has come in under budget with respect to the amounts approved in the *Corrected Stipulated Final Order (i) Authorizing Use of Cash Collateral Pursuant to Sections 105, 361, and 363 of the Bankruptcy Code, (ii) Providing for Intercompany Financing Pursuant to Sections 105 and 364, (iii) Approving the Authorized Amount on a Final Basis and (iv) Granting Replacement Liens, Adequate Protection and SuperPriority Administrative Expense Priority to Prepetition Lenders* (the "Cash Collateral Order") [Dkt. No. 135] and subsequent amendments thereto.

**A. Alleged Unnecessary and Unreasonable Duplication of Efforts**

8. Adding insult to injury, the UST Objection asserts that "neither in its application nor its time records, does HBR identify work that HBR, itself, provided to the Creditors' Committee and the Estates that rendered a direct benefit to the Estates." *See* UST Objection ¶75. Continuing on, the US Trustee states "[r]ather, it appears that HBR, as counsel to the Creditors' Committee, has played more of a 'monitoring' role in these cases, participating as such in connection with the activities that the Debtors' lawyers have initiated and pursued." *Id*. This assertion (i) is at its core incorrect; (ii) reflects a lack of understanding of the roles, duties and safeguards of a committee of unsecured creditors generally; and even worse, (iii) reflects a lack of knowledge of the facts and circumstances in *these cases* that would otherwise be apparent by attending any of the hearings or conferences past the initial hearing on the US Trustee's objection to Debtors' Counsel's first interim fee application.

9. First, as stated in 7 *Collier on Bankruptcy* ¶1103.05[1][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.):

> "A committee appointed under section 1102 is also vested with the authority to investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business, and any other matter relevant to the case or to the formulation of a plan. The investigative authority granted to a committee is extremely broad and a committee may undertake whatever investigation is appropriate to enable it to fulfill its duty to monitor the operations of the debtor and participate in the formulation of a plan."

It is the Committee's and Committee Counsel's role and duty in these cases to *independently* investigate for the benefit of general unsecured creditors any asserted liens or claims that would

have priority of payment over general unsecured claims under the Bankruptcy Code, and/or any issue or matter that may otherwise impact recoveries for creditors.

10. The UST Objection criticizes Committee Counsel for retaining foreign counsel in these cases but "never contest[ing] the secured creditors' liens. This despite the fact that it paid substantial sums to two foreign counsels in two countries to assist it with this task." *See* UST Objection ¶35. However, an elementary understanding of the Debtor's prepetition debt structure, which has been detailed in countless first-day and subsequent pleadings, would reveal that the underlying bond issuance transaction is governed by Norwegian Law and the collateral assignments of the Debtors' rig contracts with Jurong Shipyard Pte Ltd ("Jurong") for the construction of each Debtor's respective rig (each, a "Construction Contract" and collectively, the "Rig Construction Contracts") are governed by Singaporean Law; thus, necessitating Committee Counsel's aid in its review of NT's asserted liens and claims by Norwegian and Singaporean counsel who fully comprehend the language and laws of these two countries. To not seek and retain special foreign counsel under these circumstances would be malpractice.

11. The UST Objection also takes issue with the time expended "coming back to the Court nine (9) times to obtain approval of a stipulation extending the challenge period. Without more, the period of time spent on this endeavor and the end result (no challenge) calls into question the necessity and reasonableness of the fees sought." *See* UST Objection ¶76. By way of further explanation, the adjournments of the objection deadline were due, in the first instance, to NT not providing the pertinent information from its foreign counsel to perform the necessary analysis and quantification of the claims.

12. Undoubtedly, the US Trustee would have objected to the Committee needlessly commencing very expensive and time consuming litigation simply because Committee Counsel grew impatient, given the fact that it had not yet obtained the substantive justification needed, nor the legal basis to object to NT's principle claim. Furthermore, in light of the factual and financial circumstances in these cases (that NT may in fact be oversecured and that there may be enough proceeds in the Estates that creditors may recover 100 cents on general unsecured claims, based upon a resolution of the Larsen claims), it was prudent, responsible and *beneficial* to the Estates to seek adjournments of the challenge period rather than prematurely commence costly litigation and run up fees that would dwarf and exceed the costs of pursuing the extension stipulations.

13. Simply put, Committee Counsel had a responsibility and duty to review and investigate. It is not mandatory that an objection be made, especially where the parties performing the review and investigation ultimately determine that there is no basis. The "result" of the Committee's reasonable due diligence was the determination to NOT bring a challenge at that time. In fact, part of the result was in itself the conducting of effective and efficient due diligence lending to the propriety of the Bankruptcy process as a whole. HBR and foreign counsel (i) reviewed all available documentation, (ii) performed necessary legal research under applicable US, Norwegian and Singaporean laws, and (iii) determined that the liens, principle claims and security interests of the bondholders were in fact valid and perfected. An objection would have been inappropriate and frivolous. The only issue remaining was, and is, the quantification of the claims (i.e., resolving the principle and contract rate of interest on NT's

{00132467.1 \ 0764-001}

7

claims) and determining whether NT is entitled to certain default interest and prepayment penalties.

14. Moreover, the Committee was instrumental to the Debtors' motion to pay down to NT on the undisputed portions of its claims prior to the confirmation of a plan (the vehicle and mechanism under the Bankruptcy Code by which creditors realize upon their claim), saving the Estates a combined $100,000+ per day in rightful, lawful accrued non-default rate of interest. It was the Committee's review and determination that NT held valid liens and claims and proactivity to paydown the undisputed amounts (as opposed to following the normal course of paying NT's claims under a plan) that allowed for and resulted in millions of dollars saved for the benefit of the Estates and its creditors.

15. Furthermore, the Committee included in the Order approving the paydown, a reservation of rights to file an objection on the remaining issues (the "Remaining Claims") because it made no sense to commence litigation on the prepayment penalty issue at this juncture. As HBR detailed to the Court on various occasions, ultimately there may remain enough money in the Estates to pay all claims, and therefore litigation against NT will make sense only when and if it becomes apparent that allowed unsecured claims may receive less than 100 cents on the dollar. If/when this becomes evident, it may be prudent at that time to prosecute litigation against NT on its Remaining Claims. Any other course of action that involved premature and costly litigation rather than attempting to amicably resolve disputes would have been detrimental to these Estates and their creditors and wholly inappropriate at this juncture in these cases. Accordingly, the UST Objection is out-of-touch and completely out-of-line with respect to these issues.

16. The UST Objection provides that "another example [of HBR's alleged unnecessary and unreasonable duplicative efforts], involves HBR's services in connection with challenges to the claims of any of the creditors and, in particular, the claims of Larsen." *See* UST Objection ¶77. The US Trustee alleges that because HBR has not yet propounded any discovery, taken any discovery, depositions or filed pleadings in the cases with respect to Larsen other than a reservation of rights to later object to Larsen's claims, the Committee should not have reviewed the documents produced to the Debtors by Larsen (many of which were actually the Debtors' books and records still in Larsen's possession and control as former manager of the Debtors) and that the "numbers alone suggest that there has been an unnecessary and unreasonable duplication of efforts." *Id.* Yet again, the UST Objection contains a complete lack of understanding as to the status and course of action the parties are taking in these cases. Criticism of the amount of time spent by the Committee independently reviewing the Larsen produced documents is completely unwarranted.[3]

17. While a debtor and the committee have a common goal in chapter 11 cases – the confirmation of a plan of reorganization generating the maximum return to creditors and, if possible, equity security holders--it is not acceptable for the Committee to simply stand by and rubber-stamp the Debtors' findings with respect to any claims analysis that will have a significant impact on creditor recovery. *See generally, In re Penn-Dixie Industries, Inc.*, 9 B.R. 941, 944 (S.D.N.Y. 1981) (A committee has a "wide and important array of authority and responsibility … [and] the Bankruptcy Code contemplates a significant and central role for committees in the scheme of a business reorganization"). Just as the Committee could not

---

[3] While the US Trustee criticizes Committee Counsel for its review of the Larsen document production, it acknowledges the Committee's efficiencies in staffing the review, which resulted in half the fees of Debtors' review of these records.

blindly accept the Debtors' assertion of NT's perfected and valid liens and claims, and thus, investigated and performed its own due diligence, the Committee must also investigate and should independently assess the scope, validity and quantification of the single largest block of general unsecured claims filed by Debtors' former manager and insider to the Estates.

18. During the Compensation Period, the Committee found itself at a crossroads: the cases were at a critical juncture; most of the Debtors' assets had been sold; a significant portion of the sale proceeds had been used to pay principal and non-default rate of interest owed to the Debtors' secured bondholders; the bar dates had passed; and a review and analysis of claims by both the Debtors and the Committee was significantly underway. During the review and analysis of documents made available to the Committee, Committee Counsel determined that if valid unsecured claims came in at a certain level, there would be enough money in the Estates to pay NT claims in full, pay all administrative expenses, and still have a 100% distribution to unsecured claims. This, of course, all depends on the amount at which the Larsen claim is ultimately deemed allowed.

19. Against that backdrop, the Committee engaged in discussions with Larsen in an attempt to achieve a framework of a global settlement under which the claims of Larsen--currently asserted to be $155 million--would be dramatically reduced and subordinated to all other allowed claims in these cases, and Larsen's claims in the PetroRig III case would be wholly waived. Such a global settlement would likely mean that holders of all allowed claims against PetroRig I and PetroRig II will be paid in full and in relatively short order, and value will be maximized for holders of allowed claims against PetroRig III. Resolution of Larsen's claims, coupled with the fact that unsecured creditors could be paid in full which would then render

moot and useless any litigation or challenge the Committee *might* file relative to NT's Remaining Claims, was in the best interests of the Estates and necessitated the Committee's review of all documents produced by Larsen and its affiliates.

20. Further, because of Larsen's roles as the Debtors' sole manager, records keeper and operator, the Larsen-produced documents were essentially the Debtors' documents (and, upon request by Committee Counsel, were voluntarily made available for the Committee's review). To not engage in a review of these important documents would be tantamount to malpractice on behalf of Committee Counsel.

21. The Debtors are already pursuing objections to the Larsen claims in the face of a potential global settlement that is supported by the Committee and that is in the best interests of all of the Debtors' creditors. All parties have agreed to a stay of the litigation while terms of a global settlement are vetted and negotiated and, hopefully, finalized. The proposed global settlement will pay substantially all creditors, including holders of non-insider, general unsecured claims and the 9.75% bondholders, in full on their asserted, reconciled, and in the instance of Larsen, compromised claims. In contrast, continued claims litigation promises to be time-consuming and expensive, and in order to preserve the distribution to creditors currently being negotiated as part of a global settlement, the Debtors and/or the Committee would have to undertake costly, multiparty litigation that would last months, if not years, and must be successful in reducing asserted claims of more than $155 million to something significantly less than $20 million.

22. If the US Trustee had a better understanding of the status of these cases, it would realize it has no basis to raise an objection to HBR's fees regarding these issues. First and

foremost, part of the Committee's role is to undertake an independent analysis of any and all claims or matters that impact creditor recovery. *In re Williams Communications Group, Inc.*, 281 B.R. 216, 222 (Bankr. S.D.N.Y. 2002) ("Creditors' Committee has a significant economic interest…in investigating the… claims, notwithstanding its fiduciary obligation to do the same"). Indeed, instead of joining the fray of litigation which was already becoming very costly to the Estates, the Committee undertook its own independent investigation and analysis of the Larsen claims and the Larsen-produced-documents.

23. Additionally, any creditor has standing to raise a claim objection and just as the Committee could not just rubber stamp and accept as Gospel the Debtors' assertions that the secured creditors held valid perfected liens claims and security interest, the Committee likewise had a duty to undertake an independent investigation of Larsen's claims; rightfully so, since Larsen's claims were the largest single filed mass of claims--claims that would have significant impact on any recoveries in these cases. Again, to *not* undertake an independent analysis of these claims would have been malpractice.

24. Yet another aspect of the review of these documents not appreciated by the US Trustee is that the Committee was reviewing the documents for very distinct and separate purposes unique to the interests of unsecured creditors: 1) these are essentially the Debtors' operational documents and the Committee had a responsibility to review those documents as if it were reviewing any other Debtor's books and records as part of the Committee's basic due diligence of the Debtors' operations; 2) the Committee is reviewing the documents from the perspective of quantifying and determining the validity of Larsen's claims, which due to their size and magnitude will have a substantial effect on all creditors' recoveries; 3) due to certain

allegations of bad acts and/or omissions on the part of Larsen, and where Larsen was an insider and was the Debtors' sole operator and management company during the Debtors' slide into insolvency and bankruptcy, the Committee examined these books, records and documents with an eye towards possible equitable subordination of Larsen's claims to those of general unsecured creditors; and 4) the Committee is reviewing the documents with respect to numerous third-party claims where there are allegations that certain of these claims may have been previously paid by Larsen.

25. The US Trustee takes issue with the Committee's prudent and responsible choice *not* to join and further fuel costly claims litigation without its own independent analysis, as well as for *not* propounding discovery for documentation that it obtained voluntarily and without cost (the Committee obtained access to the same documents freely and voluntarily *without* propounding duplicative discovery). The mere fact that the Committee has not joined or fueled the already costly Larsen litigation has no bearing on the reasonableness of its due diligence.

26. The US Trustee's attempt to argue that because the Committee didn't propound its own discovery, it has no interest in reviewing the documents produced, flat out fails. "The function of an official creditors committee is to aid, assist, and monitor the debtor to ensure that the unsecured creditors' views are heard and their interests promoted and protected." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). As detailed above, the Committee had multiple and specific legal justifications, as well as *duties*, to review the documents that were pertinent and uniquely applicable to interests of unsecured creditors. Accordingly, the US Trustee's objections with respect to alleged unnecessary and unreasonable duplication of efforts should be overruled.

**B.     Alleged Vague Services and "Lumped" Time Entries**

27.     The US Trustee asserts generally that "HBR's fee application contains many vague time entries that do not comply with [the United States Trustee Guidelines]." *See* UST Objection ¶79.  However, the US Trustee provides only snippets of various unidentified time entries "by way of example only", thus, providing HBR and the Court with no specific entries that can be reviewed and further explained.

28.     HBR maintains detailed written records of the time expended by attorneys and paraprofessionals in the rendition of its professional services to the Committee and, in accordance with the United States Trustee Guidelines, HBR creates and breaks down its time detail into various specific descriptive billing categories, of which the following had entries for the Compensation Period:  Asset Sales, Case Administration, Cash Collateral, Claims Review and Analysis, Committee Matters, Discovery, Fee Application, General, Global Settlement, Larsen Adversary Proceeding, Legal Research, Liens Review and Analysis, Meetings and Hearings, Motions and Applications, Plan and Disclosure Statement, Pleadings, and Sale Process.  HBR utilizes these descriptive billing categories because when paired with the related time entries, the description of the billing category provides additional detail of the services, and thus, entries which may otherwise seem vague, aren't in fact vague at all.

29.     Unfortunately, HBR cannot directly address and resolve the individual time entries to which the US Trustee objects because the US Trustee has not identified the dates of any alleged vague entries, identified the billing professionals, identified any of the billing categories, or identified any other specific information that HBR could efficiently use to review

and provide clarification on the entries for which the US Trustee takes issue. Ironically, it is the US Trustee's objection that is vague, not HBR's time entries.

30. HBR also notes that in these cases, certain time entries may need to be more general than others because in accordance with the Procedures Order, retained professionals in these cases are circulating detailed time records on a monthly basis, thus providing insight as to the strategies and actions their client is taking, or preparing to take, in these cases. Often times it becomes a fine line between providing enough detail to meet the US Trustee Guidelines and protecting attorney work product, privileged information and/or strategic planning. That being noted, HBR will gladly confer with the US Trustee and further elaborate on any time entry; however, HBR asserts that it has already provided enough information and more than adequate descriptions of the work performed in its detailed time entries, which are broken down by billing categories (within the realm of protecting attorney work product, privileged information and strategic planning). Therefore, the US Trustee objections with respect to this issue should be overruled.

31. In addition, the US Trustee complains that the HBR Application contains many "lumped" time entries. Again, "by way of example only" the US Trustee provides eight specific time records.

32. To resolve the US Trustee's objection to these time entries, the identified professionals have broken down the time records listed in the UST Objection as follows:

> 2/16/10 JK Continue review of claims and spreadsheets regarding same (1.4), draft email to Advokatfirmaet Steenstrup Stordrange DA regarding same (.5), and update files regarding claims and potential objections (1.3). Total for entry (3.2)
>
> 2/22/10 JK Review all related pleadings and agreements (1.3); and review/revise/draft Committee objection (2.3). Total for entry (3.6)

3/12/10 JK Legal research regarding potential objections to Larsen claims, insider issues, breach of fiduciary issues, person/entity in control issues and entire controversies doctrine (6.7); Memo to files regarding same (.5); and update claims spread sheets and claims analysis files (.9). Total for entry (8.10)

4/6/10 JK Review PRI II and II cash and potential paydown analysis, claims spreadsheets and claim and reconcile same (1.2), document review for same (6.4). Total for entry (7.6)

4/16/10 JK Review claims register and update spreadsheets (.8), update notes on possible objections to certain claims (4.1). Total for entry (4.9)

4/23/10 JK Legal research regarding equitable subordination, joinder, claims objections, standing and insider status (7.5), memo to file and discussions with team regarding same (1.2) Total for entry (8.7)

4/26/10 JK Legal research regarding recharacterization and equitable subordination of claims (7.4) and various discussions with C. Battaglia and W. Benzija regarding same (.5). Total for entry (7.9)

5/18/10 DHL Research and analysis (2.2), meetings regarding fiduciary duty issues (.5); Drafting of memo regarding same (1.8). Total for entry (4.5)

**C.    Travel Time**

33.    The US Trustee objects to three specific time entries wherein the timekeeper has "lumped together court appearance time and travel time to court" and proposes that the Court reduce HBR's fees in the amount of $600.00, which accounts for 3 hours of travel time to and Court for hearings, charged at one-half the professional's hourly rate.

34.    To resolve this objection, HBR agrees to reduce its request for fees during the Compensation Period by the requested amount ($600.00).

**D.    Alleged Staffing Inefficiencies**

35.    The US Trustee's final objection with respect to HBR's fees alleges that HBR seeks approval for fees for services (i) provided by attorneys and paralegals that appear to have been spent on clerical duties, and (ii) rendered by attorneys that appear should have been performed by paralegals, and the US Trustee requests a reduction in any allowance of HBR fees

by $5,500. Based on the nature of this case and size of the firm, HBR finds this request completely unacceptable.

36. Specifically, the US Trustee complains that certain services must be performed by HBR's paralegals and secretaries and specifically takes issue ("by way of example only") with the following time entries descriptions as performed by attorneys:

> docket control and file maintenance; calendar due dates; update files; maintain docket control and file maintenance; monitor due dates and deadlines; communications with committee regarding recently filed fee applications for debtors' professionals; review all applications and update files; monitor lien challenge deadline issues and calendar due dates; monitor due dates and calendar issues; docket control and file maintenance; maintain computerized files; calendar dates; …create folders and files for document productions; update of claims register; review ecf filings and alert attorneys; conference with J. Keynes regarding preparing disk for stipulation; claims review and update of claims register; editing and service of april 2010 fee statement; review docket and update files.

37. HBR is a small boutique firm of 11 lawyers, 4 paralegals and a few employees that act as clerical and secretarial staff. In staffing the representation of the Committee in these cases, HBR utilizes a proper mix of senior and junior level attorneys, as well as paralegals and secretarial staff, where appropriate. HBR does not employ an army of long-term "career" paralegals to perform tasks. This is a major case involving billions of dollars of assets and claims, and hence, there are sophisticated and complicated issues involved which require a solid understanding of the background, strategies and underlying issues affecting the Debtors' Estates. Accordingly, HBR uses its junior most associates, as opposed to clerks or paralegals, to maintain and monitor claims registers and reconcile claims-related issues as appropriate. To have paralegals or secretaries perform tasks only to be duplicated by junior associates is not HBR's model for case administration.

38. Additionally, in many instances over the course of their practice, HBR attorneys find it more efficient and cost-effective to simply perform a task themselves rather than spend time conferring with paralegals or secretaries to explain detailed issues involved in each task for each case and then have the paralegal perform the task and report back to the attorney, resulting in the paralegal or secretary billing excessive time doing what the attorney could have done in one or two tenths of an hour. For example, the US Trustee takes issue with HBR attorneys billing time to, *inter alia*, calendaring due dates, monitoring due dates and deadlines; monitoring lien challenge deadline issues; docket control and file maintenance; maintaining computerized files; creating folders and files for document productions; updating claims register; reviewing ecf filings; claims review and updating claims register; as well as editing and service of a fee statement. These are all tasks that under the circumstances of these cases and this firm, can be and are appropriately performed by junior attorneys.

39. Moreover, "malpractice class 101" teaches lawyers to ensure that all deadlines and hearing dates are properly calendared and monitored. It is well within an attorney's practice and responsibility to actively take part in keeping track of the accuracy of their own calendars, deadlines, due dates and hearing dates. Indeed, while HBR delegates these types of tasks appropriately, and maintains a master calendar for all attorneys, it is ultimately the attorney's own personal responsibility to monitor dockets with respect to issues that are evolving in the case; to pay close attention to deadlines and important dates in the case; to maintain and update their own essential case files; and to generally oversee the progression of their cases. Indeed, as lead partner in this case, Chris Battaglia billed less than three hours over four months to the "general administration" task billing code in carrying out his <u>duties</u> as lead partner and

{00132467.1 \ 0764-001}

18

responsibilities and in ensuring the case files are maintained in the appropriate manner. To do otherwise would be malpractice. Accordingly, the US Trustee's request for a reduction in HBR fees by $5,500 is inappropriate under the circumstances and should be overruled.

40. In closing, as set forth herein, HBR will gladly provide any additional supplements requested by the Court or the US Trustee. Additionally, HBR has agreed to reduce its fees for travel time by $600.00. Otherwise, HBR deems all fees billed during the Compensation Period as necessary and appropriate in providing substantial benefit and value to the Estates in these cases. HBR submits that it has provided all the necessary and appropriate information to allow the US Trustee to withdaw the UST Objection with respect to HBR's fees.

**WHEREFORE**, HBR respectfully requests that this Court (a) overrule the UST Objection; (b) enter an order approving the allowance of $578,999.00 ($579,599.00 minus $600.00) for services rendered during the Compensation Period and approving the reimbursement of HBR's out-of-pocket expenses during the Compensation Period in the amount of $3,284.65; and (c) granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
August 31, 2010

                              Respectfully submitted,

                              HALPERIN BATTAGLIA RAICHT, LLP

                              By: /s/ Christopher J. Battaglia
                                   Christopher J. Battaglia
                                   555 Madison Avenue, 9th Floor
                                   New York, New York 10022
                                   Phone: (212) 765-9100; Fax: (212) 765-0964
                                   E-mail: cbattaglia@halperinlaw.net

                              Counsel to the Official Committee of Unsecured Creditors